# FEARONS v. KANSAS CITY ELEVATED RAILWAY COMPANY, Appellant.

### Division Two, March 1, 1904.

1. **NEGLIGENCE: Duty of Railroads.** Whenever the person or life of an individual is in danger from a moving car, the railroad company must exercise such reasonable care and caution as will avoid the infliction of injury.

2. ———: ———: **Anticipating Injury: Burden.** Whenever the operatives in charge of a car have reasonable ground to expect or anticipate the presence of persons so near the track as to endanger them, then they must be on the alert and be on the lookout for the anticipated or expected presence of the persons there. But the facts must be such as would warrant a reasonably prudent man to anticipate their presence there, and the burden of establishing those facts rests upon the complaining party.

3. ———: ———: ———: **Trespassers: Clear Track.** The operatives of a railroad car are entitled to the presumption that there is a clear track, and are not responsible to trespassers to be on the alert to discover them, in the absence of any reasonable grounds for anticipating their presence on the track.

4. ———: ———: ———: ———: **Liability: Wantonness.** Where the injured person is a trespasser on the track and his presence there is not to be anticipated by a reasonably prudent operative, the company is not liable for the injury except where it is wantonly and recklessly inflicted, after the discovery of his presence on the track.

5. ———: ———: **Wantonness: Tunnel: Case for Jury.** A street railway ran through a tunnel, which had for years been used as a passway by foot-travelers, with no objection from the company excepting a warning of "no admittance" at its entrance, which had long gone unheeded. The plaintiff's husband, a very old man, had gone into the tunnel, and was asked by an employee to go out, and in attempting to cross to the side of the tunnel where he could avoid an approaching car, fell into what had formerly been a conduit for a cable, and while in that position, with more than half of his body concealed, and while the employee was endeavoring to extricate him, was struck by a car and killed. The car was seen by the employee for 250 feet, and it was coming up grade, and was signalled by the employee to stop within 15 feet of the injured man, but did not stop, although it could have been stopped in 15 or 20 feet: *Held*, that it was for the jury to decide whether or not, under the circumstances, those in charge of the car would, by the exercise of reasonable caution, have discovered the presence of the man in his perilous position, and whether or not the company should respond in damages for the injury.

Appeal from Jackson Circuit Court—*Hon. James Gibson,* Judge.

Affirmed.

*Jno. H. Lucas* for appellant.

(1) The action of the trial court in declaring the law to be that under the pleadings and evidence the plaintiff could not recover was right. And it was error to set the same aside. The petition wholly fails to aver that the servants of the appellant were guilty of wanton-

ness in not stopping the train after discovering the perilous condition of the deceased. R. S. 1899, sec. 592; 14 Encl. Pleading and Practice, pp. 338, 345; Holwerson v. Railroad, 157 Mo. 224; Raming v. Railroad, 157 Mo. 507. The petition is one of simple negligence and plaintiff's cause of action must stand or fall on the question of a failure to keep a lookout for the deceased at the time of the accident. Holwerson v. Railroad, 157 Mo. 224. (2) There is no evidence in the record that the motorman saw the deceased in a perilous condition in time to have stopped the car and avoided injuring him. Weldon v. Railroad, 13 Am. & Eng. R. R. Cas. (N. S.) 762; Tully v. Railroad, 23 Am. & Eng. R. R. Cas. (N.S.) 212; Feeback v. Railroad, 167 Mo. 215; Barker v. Railroad, 98 Mo. 50; William v. Railroad, 96 Mo. 278; Rine v. Railroad, 88 Mo. 400; Maloy v. Railroad, 84 Mo. 270; Hallihan v. Railroad, 71 Mo. 113; Carrier v. Railroad, 74 S. W. 1002; Zumault v. Railroad, 74 S. W. 1015; Sharp v. Railroad, 161 Mo. 235; Cooley on Torts, sec. 600; Tanner v. Railroad, 161 Mo. 497; Loring v. Railroad, 128 Mo. 349; Davies v. Railroad, 159 Mo. 9; Mason v. Railroad, 27 Kan. 89; Anderson v. Railroad, 23 L. R. A. 206; Cheney v. Railroad, 22 L. R. A. 576. (3) There is no evidence that the motorman might have seen the deceased in time to have stopped the car, and avoided striking him.    Watson v. Railroad, 133 Mo. 246; Sinclair v. Railroad, 133 Mo. 240; Vogg v. Railroad, 138 Mo. 176; Davies v. Railroad, 159 Mo. 6; Sharp v. Railroad, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497.    (4)    The deceased was guilty of such contributory negligence as to preclude a recovery.    Zumault v. Railroad, 74 S. W. 1015.    (5) There is no evidence that the deceased was a licensee in defendant's tunnel, and all the evidence offered is insufficient to create such a relation between the deceased and the defendant.    Dahlstrom v. Railroad, 96 Mo. 99; Young v. Railroad, 156 Mass. 178; Hyde v. Railroad, 110 Mo. 272; Railroad v. Godfrey, 71 Ill. 500; Blanchard v. Railroad, 126 Ill. 416;

Railroad v. Vaughn, 93 Ala. 209; Railroad v. State, 62 Md. 479; Finlayson v. Railroad, 1 Dill. (U. S.) 579; Sturgis v. Railroad, 72 Mich. 619; Wright v. Railroad, 142 Mass. 296.

*Gage, Ladd & Small* for respondent.

(1) The tunnel having, with the knowledge of the defendant and its employees, been used for many years by large numbers of pedestrians as a footpath, the employees of the defendant in charge of the car knew that the presence of such persons in the tunnel might reasonably be expected or anticipated; and it was therefore their duty to keep a careful lookout in order to discover such persons, and if they failed to do so, and the death of Fearons resulted from such failure, they were guilty of actionable negligence.    Morgan v. Railroad, 159 Mo. 262; Kreis v. Railroad, 131 Mo. 533;    Chamberlain v. Railroad, 133 Mo. 587; Williams v. Railroad, 96 Mo. 275; Guenther v. Railroad, 95 Mo. 286;    Guenther v. Railroad, 108 Mo. 18; Fiedler v. Railroad, 107 Mo. 645; LeMay v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601;    Powell v. Railroad, 59 Mo. App. 626; Garner v. Trumbull, 94 Fed. 321; Ashworth v. Railroad, 116 Ga. 635; Bullard v. Railroad, 116 Ga. 644; Crawford v. Railroad, 106 Ga. 870; Arrowood v. Railroad, 126 No. Car. 629; Troy v. Railroad, 99 No. Car. 298; Jones v. Railroad, 61 So. Car. 556; Taylor v. Canal Co., 113 Pa. St. 162; Fleming v. Railroad, 106 Tenn. 374; Hansen v. Railroad, 105 Cal. 379; Railroad v. Crosnoe, 72 Tex. 79; Railroad v. Smith, 87 Tex. 348; Railroad v. White, 84 Va. 498; Railroad v. Rogers, 100 Va. 324; Harriman v. Railroad, 45 Ohio St. 11; Corbett v. Railroad (Utah), 71 Pac. 1065; Mason v. Railroad, 89 Wis. 151; Railroad v. Schuster (Ky.), 7 S. W. 874; Railroad v. Keelin (Ky.), 62 S. W. 261; Klockenbrink v. Railroad, 172 Mo. 678; Ranier v. Railroad, 39 W. Va. 50; Gunn v. Railroad, 42 W. Va. 676.    (2) If it had been necessary to establish the permission of the defendant

or acquiescence by it, in the use of the tunnel by the public, the question was one for submission to the jury. Railroad v. Lowell, 151 U. S. 209; Hansen v. Railroad, 105 Cal. 379; Taylor v. Canal Co., 113 Pa. St. 162; Railroad v. Rogers, 100 Va. 324; Troy v. Railroad, 99 No. Car. 298. It was in evidence that once, for a limited period, a guard or watchman had been stationed at the east end of the tunnel for that purpose. But even he had been withdrawn. This in itself was significant. Witness after witness testified as to the habit of people passing through without objection from any source, of which they ever heard. Such a situation as this was well calculated to lead everyone to suppose that the sign was a mere *brutum fulmen,* and so intended and regarded by the company; and that notwithstanding the presence of the sign, the company was indifferent to the use of the tunnel by foot passengers. If, when the sign failed to perform its mission, and the company knew that its prohibition was the subject of almost continuous violation, it had really wished to keep people out and objected to their entrance, it would have taken more effective measures of some kind, to accomplish that object. The non-action of the company under these circumstances, was most cogent evidence of acquiescence. (3) The learned counsel for appellant criticises the petition, and is dissatisfied because the plaintiff does not characterize his client's servant as guilty of murder, and adorn her complaint with the language of vituperation. The petition states the facts as they were understood by the plaintiff, and, as it has transpired, as they were developed at the trial. The brief kindly suggests what the petition ought to have stated. According to it there should have been an averment "that deceased was without any known cause on the private way of the defendant, in a position of peril, and defendant's motorman, knowing of his presence and peril, wantonly and designedly ran upon and killed the deceased." If the petition had contained the aver-

ments suggested by counsel, the respondent would not be represented here in this court. Her case, if tried on such a petition, would have been hopeless indeed. There is nothing in the facts to justify, or which tends in any degree to prove, such averments. There is nothing whatever in the evidence from which any reasonable mind would infer that the motorman knew of Fearons' peril and intentionally ran over and killed him. The case is one of negligence, and so it was brought. Negligence in failing to perform a duty imposed by law— the duty of looking out in order to discover a person in danger. Such is the petition and such is the case made. If there was no such duty, the case will fail. But it will not fail because the motorman knowingly and intentionally inflicted the injury. He was not guilty of that offense.

FOX, J.—The petition upon which this case was tried is as follows:

"Plaintiff, for her amended petition, states that she was at the time of his death, as hereinafter mentioned, and had been for many years prior thereto, the wife of George R. Fearons. That the defendant is and for many years past has been a corporation, created, organized and doing business under the laws of the State of Kansas, and as such did, on the 5th day of April, 1899, own, and was then and for some time prior thereto had been operating, a street railroad from Delaware street in Kansas City, Jackson county, Missouri, west along Eighth street to Washington street, at or near which said last mentioned street said railroad and its tracks entered a tunnel, through which it passed for several hundred feet on its way to a station of said railroad, at or near the Union depot in said Kansas City. That the motive power employed by the defendant in the operation of its said railroad and in moving its cars, was electricity. That on said 5th day of April, said tunnel was and had been daily, for a period of several

years immediately preceding said date, with the full knowledge of the defendant and all its officers, agents, servants and employees, used and treated as a thoroughfare by large numbers of persons not employees of the defendant, who were in the habit of walking to and fro therein, and upon the tracks therein, in the same manner and with the same freedom as if the same had constituted a public highway of said Kansas City. That in view of said frequent and habitual use of said tunnel and its tracks by foot travelers, with the knowledge of the defendant, it was the duty of the defendant and its officers, agents, servants and employees, who might run, conduct or manage the cars of the defendant, while the same were moving along the tracks in said tunnel, to keep and maintain a sharp and watchful lookout for persons who might be on said tracks in front of cars moving thereon, and thereby exposed to danger, so that upon their discovery, the cars might be stopped in time to prevent their running against or over such persons and thereby injuring them. That on said 5th day of April, 1899, while the said George R. Fearons, in the exercise of due care, was in said tunnel and upon one of the tracks of the railroad of the defendant, he was, by the negligence and unskillfulness of the officers, agents, servants and employees of the defendant in running, conducting and managing a car of the defendant, which was being moved by the defendant along said track, while in charge of its said officers, agents, servants and employees, run over and knocked down by said car, and thereby received injuries, in consequence of which he died upon the same day. Plaintiff states that while the said George R. Fearons was upon said track at the time and in the manner aforesaid, the officers, agents, servants or employees of the defendant in charge of said car, and who were then engaged in running, conducting and managing said car, saw, or by the exercise of ordinary care on their part might have seen, the said George R. Fearons, and have become aware of

the danger to which he was exposed while on said track as aforesaid, in ample time to have stopped said car before it reached him, and thus have avoided striking and injuring him, but they negligently failed to keep a sharp or watchful lookout for persons who then might be on the track in front of said car, and negligently failed to stop the same, but negligently caused and permitted the same to strike the said Fearons, in consequence of which he received the injuries which resulted in his death as aforesaid. Wherefore, plaintiff prays judgment against the defendant for the sum of five thousand dollars.''

The answer was: first, a general denial; second, that the deceased, at the time he received his injuries, was a trespasser on defendant's tracks, and that he was guilty of contributory negligence; third, that the deceased was of weak and feeble mind, and the plaintiff was guilty of negligence directly contributing to the injuries received by him in permitting him to go about without being properly protected, watched or guarded, and without taking proper precautions to prevent his going into places of danger.

The reply was a general denial.

We have examined the testimony in this cause, as disclosed by the record, and find that it is no exception to the general rule in such causes, and that the evidence, upon a number of material questions, is conflicting.

By comparison with the record, we find that the testimony at least tends to show the facts as stated by counsel for respondent, which are as follows:

''On the 5th day of April, 1899, the defendant owned and operated an electric street railway in Kansas City. Its eastern terminus was the intersection of Eighth and Delaware streets, and from that point it ran as a surface road west along Eighth street for several blocks, until it entered a tunnel at a point from 125 to 130 feet west of the west line of Washington street, the latter being a north and south street intersecting

Eighth street.    From Washington street the track con-
tinued to run west along the space where Eighth street
would have been if extended, until it reached the east-
ern mouth of the tunnel.    The tunnel was 811 feet in
length and pierced the bluff which rises from the flat
known as the West Bottoms, in which is located the Un-
ion depot in the western part of the city.    The western
opening of the tunnel was about half way up the west-
ern side of the bluff, from 40 to 55 feet above a street
running at its base, to which the western face of the
bluff sloped.    From the western opening of the tunnel,
the track proceeded, in a general westerly direction, as
an elevated road built upon a trestle, until it reached an
elevated station near the Union depot, and from there
proceeded still further west for quite a distance as an
elevated road.    The tunnel is oval or round; its roof be-
ing from 25 to 28 feet above its surface.    Over the
mouth of the tunnel at either end were signs which said
'No Admittance,' or language to that effect. They were
overhead, and one witness, who lived in the neighbor-
hood, testified that he had never noticed them.

"There were no barriers to prevent teams from
driving or persons from walking along on Eighth street
into the tunnel, and one witness related an incident of
some men driving into the tunnel from the east by mis-
take at night.    Nor was there any watchman kept at
either entrance to warn people or prevent them from
entering the tunnel, although it seems that at one time
for a short period a flagman or watchman had been sta-
tioned at the east end of the tunnel, and that the house
which had sheltered him was still there.

"It is thickly settled and built up from the mouths
of the tunnel, both east and west.    Workmen going to
and returning from their work in the west bottoms, chil-
dren and other people in great numbers, had been in the
habit of walking through the tunnel, daily.    This was a
custom which, according to the testimony of several wit-
nesses, had prevailed for a long period—5 years, 7

years, 10 years; according to the extent of the observation of the witnesses respectively. There is a spring in the tunnel near the west end, provided with a drinking cup, and people frequently went there for water. None of these witnesses ever knew of objections or effort to prevent such use of the tunnel by foot passengers. The witnesses who testified to such accustomed use of the tunnel, lived in its immediate neighborhood, some of them in houses just adjoining its eastern opening. Beaten paths, showing long use, led on each side of the railroad trestle from the street below directly into the western mouth of the tunnel in the face of the bluff.

"The accident which resulted in the death of Geo. R. Fearons occurred April 5, 1899. Mr. Fearons was between 77 and 78 years of age. The only living eye-witness of the accident, so far as known by the plaintiff, was Park Newgent. At the time of the trial he lived in the State of Kansas and was brought to the trial by the defendant company. He was sworn on behalf of the plaintiff. He testified that at the time of the accident and for two months before, he was in the employment of the defendant, and continued in that employment for about eight months afterwards. His business was to sand the tracks of the tunnel in rainy or wet weather; that is, to shovel sand out of a bucket and put it on the rails of the track. He said that when he was there he kept people out of the tunnel as well as he could, but *he had no instructions* to do so. The accident to Mr. Fearons happened shortly after one o'clock p. m. Newgent testified that he himself was just inside the east end of the tunnel when a train came along from the west, and as it passed him, Mr. Bullock, the assistant superintendent of the company, who was standing on the front end of the car, shouted to him to run down into the tunnel and tell the old gentleman to get out. Newgent did not know that Fearons was in the tunnel until Bullock told him. After Bullock spoke to him, Newgent looked down towards the other end of the tun-

nel and then saw Fearons. He ran down and found
Fearons inside the tunnel, about 250 feet from the west
end. There were two tracks in the tunnel, one for east-
bound and the other for west-bound cars. East-bound
cars, coming up into the city, ran on the south track;
west-bound cars on the north track. The distance be-
tween the tracks was seven feet.

"When Newgent reached Fearons, the latter was
between these two tracks, walking up towards the east
end of the tunnel. It had formerly been a cable rail-
road and there was a conduit between the rails of each
track in which the cable had at one time run. These
conduits were open at the top, the opening being about
two feet wide. They were two and one-half or three
feet deep. When Newgent reached Fearons, he told him
he would have to go out as fast as he could, because
there was a car coming. There was no car in sight, but
Newgent could hear one coming from the west. The
car was not then in the tunnel, and the track, after it
left the western opening of the tunnel, curved to the
south or left so that one standing in the tunnel could
not see a car approaching from the west on the curve.
When Newgent told Fearons he would have to get out,
Fearons made no motion or effort to get out, although
Newgent urged him to go, but Fearons said, 'How can
I get out'? and repeated four or five times, 'How can I
get out'? Newgent then told Fearons to get out of this
seven-foot space between the two tracks and step across
the south conduit and stand up against the wall, and the
car would pass him; 'there was room between the wall
and the car for him to stand if he had stood with his
heels right against the wall.' Fearons undertook to step
across the conduit in accordance with Newgent's sug-
gestion, and stepped or fell down into it. Fearons'
height was about five feet, four and one-half inches.

"As soon as Fearons fell into the conduit, Newgent
leaned over, grabbed hold of him, and tried to pull him
out. He had hold of Fearons' body, and tried, as he

thinks, for about a minute to get him out.   While New-
gent was so engaged, Fearons' head and 'about half of
his body' were above the opening.   The top of the open-
ing 'came up about half way to his breast.'   Newgent
says 'Fearons would not help himself.'   Newgent testi-
field that while he was endeavoring to raise Fearons out
of the conduit, he saw a car coming into the tunnel at
its western mouth, and waved his hands at the motor-
man and shouted and tried to stop the car.   As the car
entered the tunnel Newgent and Fearons were 250 feet
away from it.   Upon cross-examination Newgent testi-
fied that the car was about fifteen feet from him when
he waved at it.   Newgent does not know whether the
motorman saw him or not when he was waving his hand
at him.   The car did not stop or slacken its speed but
proceeded eastward on its way through the tunnel to
Washington street.   When Newgent saw that the mo-
torman did not intend to stop, he himself jumped out
of the way and told Fearons to put his head down in
the conduit and the car would pass him.   Fearons did
not do so, but tried to hold by the side of the conduit.
The car then struck him, and as a result of his injuries
he died immediately after being removed to the police
station in an ambulance.

"The tunnel was straight; a person could look
through it from one end to the other.   During the whole
period occupied by the car in moving the distance of
250 feet from the western mouth of the tunnel, a good
part of Fearons' body was above the opening of the
conduit, and Newgent was on the track at its side, lean-
ing over and struggling to extricate him from his des-
perate situation.   There is some evidence tending to
show that the motorman, if he had maintained a look-
out ahead, would, in time to have prevented the acci-
dent, have discovered these two men and seen the efforts
which Newgent was making to save Fearons.   The car
was moving from west to east on an ascending grade

and might have been stopped in a space of from fifteen to twenty feet.

"At the close of the plaintiff's testimony, the court sustained a demurrer to the evidence, and instructed the jury that the plaintiff could not recover. Whereupon, the plaintiff took a nonsuit, with leave, etc., and afterwards filed her motion to set the same aside. This motion was sustained by the court and an order made granting a new trial. From that order the defendant prosecutes this appeal."

### OPINION.

There is but one legal proposition involved in this cause.

At the close of the testimony, the court sustained a demurrer to the evidence, which resulted in plaintiff taking a nonsuit, with leave to move to set the same aside, and afterwards filed her motion to set aside such nonsuit, which motion was sustained and a new trial granted.

The question confronting us in this controversy is the correctness or incorrectness of the trial court's action in sustaining the motion to set aside the nonsuit and granting a new trial.

The proposition before us must find its solution in the application of correct legal principles to the ultimate facts which the testimony tends to prove. We take it, that it is unnecessary to cite authority in support of the proposition that, if there is testimony tending to prove any fact necessary to be found in order to authorize a recovery, it is sufficient to authorize the submission of the question to the jury, if the testimony tends to prove the facts sought to be established.

This unfortunate accident occurred in a tunnel, which the testimony shows connects two sections of a large and populous city. The defendant was operating its railway through this tunnel, and the husband of re-

spondent was killed by being run over by one of defendant's cars.

The record in this cause discloses, beyond dispute, testimony by witnesses living in the neighborhood of the tunnel, tending to prove that it was a custom and habit of workmen, in going to and returning from their work, also children and numerous other people, of walking through this tunnel. The proof further tends to show that this was a daily occurrence, and had been for- a number of years, some of the witnesses fixing the period at five, others at seven and ten years.

The only objection to the use of this tunnel was indicated by the sign, "No Admittance." This signal was not heeded, and if the number of pedestrians passed through the tunnel daily, as the testimony tends to show, it is but a fair and reasonable inference that the motormen and conductors operating defendant's cars continually, knew that this signal, "No Admittance," was unheeded, and that the numerous people spoken of by the witnesses were using this tunnel as a passway.

It is upon this particular branch of the testimony that the legal proposition before us hinges.

It is earnestly contended and very ably argued by appellant that plaintiff's husband was a mere trespasser, and that the railway company owed him no duty, and hence can not be made to respond in damages for his death, except on a showing that he was wantonly, willfully and recklessly killed by defendant's agents and employees, in the operation of the cars.

On the other hand, it is with equal ability and earnestness contended and argued, by respondent's counsel, that even though it be conceded that the deceased had no legal right to pass through the tunnel, and may be classed as a trespasser, the allegations in the petition as to the use by the public of the tunnel as a passway, and the testimony tending to prove such allegation, constitute the exception to the rule contended for by appellant.

These two contentions sharply present the only vital question involved in this controversy.

We are materially aided, in the investigation of the proposition confronting us, by the able and exhaustive briefs of counsel for both appellant and respondent. To undertake a review of all the cases cited would subject this opinion to the just criticism of being unreasonable in length, without serving any good purpose for the bench, bar or the public. We must, therefore, be content with a careful examination and analysis of the cases to which our attention has been called, and the announcement of the rule which is in harmony with the weight of authority.

The principle involved in the case at bar is by no means a new one in this State. This court, in a number of cases, has given expression in no doubtful terms, to its views upon this subject. A careful examination of the Missouri cases, where similar questions have been involved, will demonstrate clearly a line of demarcation between the two contentions. The doctrine announced in the two lines of decisions are not in conflict; but the principles are correctly declared, as applicable to the facts in each case. These rules, as to the care and caution to be exercised by operatives of railways, spring from the dangerous character of the business. The law has a right to demand, in the operation of railways, whenever the person or life of an individual is in danger, the exercise of such reasonable care and caution as will avoid the infliction of injury.

It is sought, in the announcement of legal principles, to make the application of the rules upon this subject, reasonable, both as to the railways and the public.

From the application of these reasonable rules, springs the distinction made manifest by the decisions, not only of this court, but, as well, in other jurisdictions.

The distinction drawn by this court may be briefly stated thus: that, whenever the motorman or engineer,

in the operation of its cars, before reaching a point along the line of its railway, has reasonable ground to expect or anticipate the presence of persons so near the railroad track as to endanger them, then the law, through its high regard for the preservation of human life, requires and demands such operatives to be on the alert, and to keep a lookout for the realization of the anticipation or expected presence of the person. Of course, this rule requires that the facts surrounding the given case shall be of such character as would warrant any reasonably prudent man to expect or anticipate the presence of the persons at the point on its road, and the burden of establishing these facts rests upon the party alleging them. On the other hand, the operatives of a railway are entitled to the presumption that there is a clear track and while care and caution should be exercised in the operation of their trains, they are not responsible to trespassers for failure to be on the alert to discover them, in the absence of any reasonable grounds for the expectation or anticipation of their presence on the track. In other words, they are not specially required to look out for persons who have no right to be there and whose presence was neither expected or anticipated. Under those circumstances, the liability results from a wanton and reckless injury inflicted, after the discovery of their presence. But, again, if it is at a point where there is reasonable ground for expecting or anticipating the presence of persons, the presumption of a clear track is destroyed, and even though the persons be trespassers, it does not relieve those in charge of the moving cars from keeping a careful lookout for the person so expected to be present at that point.

There was sufficient testimony in this cause, at least, tending to show a state of facts, in respect to the use of this tunnel as a foot passageway, from one section of the city to the other, as would authorize the submission of the case to the jury.

As before indicated, the court should place the burden upon plaintiff, of establishing such daily use of this tunnel by the people, and the knowledge of it by defendant, as would reasonably warrant those in charge of the car in expecting and anticipating the presence of persons going through this passageway. If the adjudicated cases by this court, involving the same principle as the one at bar, are to guide us in the determination of this proposition, then there is no escaping the correctness of the conclusion reached.

The proposition involved in this case was clearly stated, and the principle pointedly announced, in Chamberlain v. Railroad, 133 Mo. 587; it was said by the court, through GANTT, J.:

"The testimony in behalf of plaintiff tended strongly to prove that for a number of years prior to this unfortunate killing, a good many workmen and pedestrians were in the habit of using these tracks of defendant in going to and from their work and more particularly in the early morning from 6 to 7."

Upon that state of facts, the principle was declared that it was the duty of the employees in charge to exercise ordinary care in discovering the person in jeopardy, and the peril in which he was placed, before reaching him, and the failure to exercise such care was denounced as negligence, upon which a recovery could be maintained. This court, both in Division and in Banc, approved the instruction embracing such principle.

In the course of the opinion in that case, the court very clearly gives expression to its reasons for the approval of the principle involved. It said:

"The first essential inquiry, obviously, must be to ascertain and determine what were the duties of the defendant's trainmen on the morning and at the place plaintiff's husband was killed and how, if at all, they failed to discharge that duty, for, unless the law cast upon them a duty, there could be no negligence.

"That the deceased was a trespasser and guilty of

negligence is perfectly plain, but conceding this, as all fair-minded men must, did the servants of defendant owe him no duty whatever? Will it be seriously asserted that merely because the deceased walked upon this open track where many others constantly did the same thing, with the presumed knowledge of defendant and its servants, he could be run down and crushed without notice or warning and without effort on the part of the employees in charge of the train to prevent his destruction? This must be answered by a reference to the time and place.

"While the track belongs to the railroad company and it may run as many trains as it sees fit and as fast as it may desire, as a general proposition, it is now firmly established, in this State, that it must observe a proper regard for human life in running through towns and populous neighborhoods and at those places on its road where, by the forbearance and tacit consent of the company itself, persons are in the habit of walking or riding over, or along, the track, even where there are not public crossings. . . .

"Under such circumstances we do not deem it debatable that the servants of the defendant owed the deceased and Williams the duty of warning them if they saw them, or, by the exercise of ordinary care, could have seen them, in time to enable them to get off the track, without injury, even though they were trespassers."

In Williams v. Railroad, 96 Mo. 275, the principle now being discussed is very tersely stated by BLACK, J. He said, quoting from Shearman & Redfield on Negligence:

" 'But it has been held that if common experience has shown that persons or cattle are constantly upon the track, a recovery may be had for injuries suffered by them through the neglect of the engineer to look after them, even if he did not see them.' "

Vol 180 mo—15

The learned judge then deduces this principle from the quotation from the text-writers as mentioned. He says:

"Thus it will be seen that cases may and do arise where, though the company is entitled to a clear track, it can not be fairly presumed that the track will be clear. A duty then arises to look out, and the liability is not limited to want of care after discovery of the danger. Instances of such cases have been given, and perhaps the rule can not be generalized in better terms than that quoted from Shearman & Redfield."

To the same effect is Fiedler v. Railroad, 107 Mo. 645. In that case, the views of this court upon this question are made apparent by a plain and clear statement of the proposition involved, which is very similar to the one disclosed by the record before us. It said:

"That the girl was a trespasser by the statute law of the State is clear, but the evidence of the conductor and fireman of the train is undisputed that, at the hour this train passed this point, a great many people were in the habit of walking on and across these tracks. It was a place where the trainmen might expect to find pedestrians on the track. . . . In the construction of that statute in Barker v. Railroad, 98 Mo. 50, this court held the trainmen were under no obligation to be on the watch for a trespasser at a place where there was nothing in the surroundings that would naturally lead them to suspect that persons would be on the track. But because of the known propensity of children and even adults to take the chances of walking on those tracks in populous cities or districts, the rule has been long settled in this State, that when there is reason to apprehend that the track may not be clear, notwithstanding the right of the company to have it clear, the persons operating a train can not act on the presumption that the track is clear without being responsible for the consequences."

BURGESS, J., in Kreis v. Railroad, 131 Mo. l. c. 544, very aptly applies this principle to a state of facts very; similar to the facts in the case at bar.  He said:

"The conduct of Mrs. Kreis in walking so near the track of defendant's road with an umbrella over her head and so near the track as to be in danger of being struck by a passing train which she knew was then past due, was negligence; but defendant's servants and employees in charge of the train knew that pedestrians in that vicinity were in the habit of walking along between its tracks at that point, and if they either saw, or might have seen, by the exercise of ordinary care and watchfulness, her perilous position in time to have checked the speed of the train, or if they failed to use all necessary means at their command after they saw her perilous position to prevent the accident, consistent with their duty to defendant and the safety of the passengers and the property of the railway company, and failed to do so, and because of such want of such care and watchfulness the train collided with and killed her, the defendant should be held liable."

This proposition should be set at rest by the unanswerable reasons assigned by that learned and esteemed Missouri judge on the Federal bench, in Garner v. Trumbull, 94 Fed. 321.  The trial court had given a peremptory instruction in that cause, to find the issues for the defendant, who was the receiver of a railroad company.  The facts, in many respects, were similar to the facts in this case.  At least, the principle involved was the same.  THAYER, J., in reversing that case, said:

"There are some adjudged cases which doubtless support such a view, but we are persuaded that it is not a correct rule, as applied to those portions of a railroad track which many people have been in the habit of using as a footpath for a considerable period, without objection on the part of the railway company, although without any express license to do so. *Train operatives ought to be required to take notice of such usages and of con-*

*ditions which actually exist, and to regulate their actions accordingly.* A proper regard for the safety of persons and property entrusted to their charge, and for human life in general, should impel them to do so. *When, therefore, for a considerable period, numerous persons have been accustomed to walk across a railroad track or along a railroad track between given points, either for business or pleasure, railroad engineers should take notice of such practice, and, when approaching such places, should be required to exercise reasonable precautions to prevent injuring them.* Knowing the usage which prevails, *they may reasonably be required to anticipate the probable presence of persons on or near the track at such places, and to be on the lookout* when their attention is not directed to the performance of other duties. The natural impulses of a person who has a proper regard for the welfare of others would prompt him to thus act. . . .

"In view of the testimony tending to show the extent to which the track at the place where the accident occurred had been used by the public, and the length of time such use had continued, *we think it was the province of the jury to decide whether such use had not been of such standing and of such a nature* as to impose on train operatives, on aproaching that locality, *the duty of anticipating the probable presence of persons on or near the track, and of exercising ordinary watchfulness to avoid injuring them.* And, on the assumption that the jury would have found the engineer or fireman was under an obligation *to keep a lookout for persons who might be on or near the track,* we are also of opinion that the testimony concerning the distance at which the child might have been seen before it was run over (one witness, who had measured the distance, saying that it could have been seen for 2,300 feet) rendered it necessary for the jury to determine whether the engineer and fireman did in fact exercise ordinary care to discover the child."

Numerous other cases in this, as well as other States, fully support the conclusions reached by the court in this cause: Guenther v. Railroad, 95 Mo. 296; Lynch v. Railroad, 111 Mo. 601; LeMay v. Railroad, 105 Mo. 361; Morgan v. Railroad, 159 Mo. 262; Ashworth v. Railroad, 116 Ga. 635; Railroad v. Schuster (Ky.), 7 S. W. 874; Railroad v. Smith, 87 Tex. 348; Taylor v. Canal Co., 113 Pa. St. 162; Railroad v. Rogers, 100 Va. 324, and numerous other cases.

Our attention is directed by the learned counsel for appellant to numerous cases decided by this court, in support of the contention so earnestly urged. An analysis of those cases makes it apparent that they are distinguished from the former line of cases, supporting the action of the trial court, by reason of the facts developed, from which the rule in those cases was deduced.

In Holwerson v. Railroad, 157 Mo. 216, there was no testimony which furnished any reasonable ground for expectation or anticipation of the presence of the person injured. Hence, the vital question involved in this case did not arise in that one, and, therefore, is inapplicable to the question before us.

In Williams v. Railroad, supra, it is made clear, from the opinion, that Judge BLACK's conclusions were reached by reason of the facts in that case. There was an absence of any testimony which destroyed the presumption that those in charge of the train were entitled to a clear track, and the result of the conclusions was predicated upon that fact.

Our attention is especially directed to Barker v. Railroad, 98 Mo. 50, and Rine v. Railroad, 88 Mo. 392. Those cases are clearly distinguished from the one before us by the subsequent cases of Fiedler v. Railroad and Morgan v. Railroad, supra. The quotation herein from the Fiedler case makes clear the distinction to be drawn from the Barker case.

VALLIANT, J., in the Morgan case, after a full and careful review of all the authorities, very aptly draws

the distinction in those cases and makes apparent their inapplication to the question involved in the one before us. He says:

"There are other cases in our reports on this subject, but those above quoted are sufficient to show that the law on this point has been well considered and definitely settled by this court, and our decisions are all in harmony. The liability of the defendants in the Rine and Barker cases being limited to the negligence of the trainmen after they became aware of the perilous position of the person in jeopardy, because the facts of those cases did not justify a wider range of inquiry, and in the other cases extending it to negligence in failing to use the means at hand to prevent the injury when they might with ordinary care have discovered the peril. In the one class of cases the train crew had no reason to expect a man to be on the track, in the other class they had reason to expect such a condition, and the duty of those handling the train varied as the circumstances required."

The case of Carrier v. Railroad, 175 Mo. 470, in no way conflicts with the conclusions reached in this cause. There was no reason to expect or anticipate Mr. Carrier's presence at the point where he was injured, and those in charge of the train owed him no duty. That case was correctly decided, and is in harmony with the unbroken line of cases upon the state of facts as developed in that case.

Hyde v. Railroad, 110 Mo. 272, apparently seems to be in conflict with prior and subsequent decisions of this court on the question now being discussed; by a careful examination of the ruling in that case, it will be demonstrated that the conflict is more apparent than real. The announcement of the conclusion in the Hyde case was occasioned from the special facts as developed, surrounding it. If it is to be construed as contended for by appellant, then we simply say, it is not in har-

mony with the overwhelming weight of authority on that subject, and will not be followed.

Further discussion of the question before us can serve no good purpose. ⸴ Hence, we deem it unnecessary to assign further reasons for a conclusion which is so manifestly in harmony with the weight of authority.

The conclusion reached is by no means to be construed as even an intimation as to what should be the ultimate finding of the jury, upon the controverted questions submitted to them; but we simply mean to say that the testimony at least tended to establish a state of facts which would authorize the court in submitting the cause to the jury, and afford them an opportunity of passing upon it.

Finding no error in the action of the trial court, in setting aside the nonsuit and granting plaintiff a new trial, the judgment should be affirmed, and it is so ordered.

All concur.