## -ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

## MARCH TERM, 1911.

---

(Continued from Volume 157)

---

## BERTIE ERVIN, Respondent, v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY, Appellant.

### Springfield Court of Appeals, June 12, 1911.

1. **RAILROADS: Injury to Person on Track: Pedestrians Use of Track: Negligence: Demurrer to Evidence.** Plaintiff's husband, while walking upon defendant's railroad track, was run over and killed by its train. The engine at the time was pushing in front of it a caboose and in front of the caboose a loaded box car. The conductor and brakeman were on top of this box car and saw deceased step upon the track in front of the approaching car. They immediately shouted to the deceased and the brakeman at the same time gave the emergency stop signal to the engineer. Deceased was very deaf but this was unknown to the trainmen. There was evidence tending to show that the track at this point was being used considerably by pedestrians and also evidence tending to show that the engineer might have stopped the train in less time than he did after the signal to stop was given and thus avoided striking deceased. The engineer could not see the deceased and did not know a man was on the track. The evidence is fully examined and reviewed and *held* that defendant's demurrer thereto was properly overruled.

2. ———: ———: ———: ———: **Question for Jury.** In an action for the death of a person run over by a railroad train while walking on the track where the evidence as to user tends to show that at the time and place of the accident the public,

158 App.]                    (1)

without objection on the part of the railroad company, had used the railroad track as a pathway, the question of license or implied invitation to use the track is one of fact for the jury and in such case it is the province of the jury under proper instructions to determine whether or not those operating the train thereon, under the circumstances, had reasonable grounds to anticipate the presence of persons on the track.

3. ——: ——: ——: ——: **Right to Expect Clear Track: Trespassers.** In the absence of a showing of a user of a railroad track by pedestrians of such a character and extent as would warrant a reasonably prudent man to anticipate the presence of persons thereon, the men operating the train are entitled to the presumption that there is a clear track and are not required to maintain a lookout for trespassers.

4. ——: ——: ——: ——: **Duty to Keep Lookout: Trespassers.** At places on the track where there is reasonable ground for expecting or anticipating the presence of persons, the presumption of a clear track is destroyed and even though the persons be trespassers, it does not relieve those in charge of the moving cars from keeping a careful lookout for the persons so expected to be present.

5. ——: ——: ——: ——: **Burden of Proof.** The burden of proving established user of a railroad track by pedestrians, such as to destroy the presumptions allowed to the operatives that there is a clear track, rests upon the party alleging it. Liability depends upon the knowledge or notice of such user and such notice may be proved by the long continued going to and fro of people more or less constantly along or over such track.

6. **PRACTICE: Instructions: Exceptions: Appeal and Error.** An exception to instructions generally has always been considered sufficient in this state without pointing out in detail to the trial court the specific instruction challenged.

7. **RAILROADS: Injury to Trespassers: Engineer Failing to See Trespasser.** Where a trespasser on a track is struck and injured by a train at a place where the railroad has a right to expect a clear track and owes no duty to lookout for persons on the track, then in order to fix a liability on the company, the plaintiff must show that the person injured was actually seen by the engineer in time to have warned him and thus have avoided the injury.

8. ——: ——: ——. Where a trespasser was run over and killed by a train, and the engine was pushing in front of it a caboose and box car, and the brakeman, who was on top of the box car saw the trespasser in a place of peril on the track in front of the train, and gave an emergency stop signal to the engineer, which the engineer saw, but the engineer could not

Ervin v. Railroad.

see the track in front of the train and did not know that a person was on the track, *held*, that if the trespasser was on the track at a place where the company had a right to expect a clear track, then the engineer would owe no duty to the trespasser to respond to the stop signal and his failure to respond and stop the train would not be negligence for which the railroad company would be responsible for the trespasser's death. COX, J., *dissents*.

9. INSTRUCTIONS: Railroads: Injury to Trespasser: Pedestrians Use of Tracks. There are two indispensable constituents of user that should be properly presented by the instructions in a case where a trespasser has been injured or killed at a place on the track which the evidence tended to show had been used by pedestrians: (1) the character, nature and duration of the user: (2) the consent of the railroad company to such user, or its knowledge or acquiescence therein.

10. RAILROADS: Pedestrians Use of Track: Use Must Be Habitual: Injury to Trespasser: Instructions. In an action against a railroad company for death of plaintiff's husband who was run over by a train while walking on defendant's track at a place where plaintiff claimed it had been used by pedestrians as a pathway to such an extent as to require defendant to keep a lookout for trespassers, plaintiff's instructions as to user were *held* erroneous, for the reason that they only required that the track must have been used for several years with the consent, acquiescence and knowledge of defendant, and from such instructions the jury had a right to infer that mere desultory or occasional use of the track by pedestrians was sufficient; and that the instructions should have required the jury to find that there was a habitual use of the railroad track as a pathway by pedestrians or that it was constantly so used by the public.

11. ————: ————: Extent of User. To require of a railroad company the duty of keeping a lookout for trespassers at a particular place on a track on the ground of user by the public, the evidence must show that the travel had been so continuous, frequent and well-established as to raise an inference of knowledge and acquiescence on the part of the company in such use of the track and thus impose on its servants a duty to maintain a lookout for pedestrians.

12. ————: Death by Wrongful Act: Action Under Penalty Statute: No Recovery for Compensatory Damages. Section 5425, Revised Statutes 1909, which provides that where a person is killed on account of the negligence or wilfullness of the employees of a corporation while running a train, the corporation shall pay as a penalty the sum not less than $2000 and not exceeding $10,000 in the discretion of the jury is held to give only punitive damages, and not compensatory damages and it is

Ervin v. Railroad.

error to admit evidence tending to show the damages to plaintiff by reason of the death of the deceased, and also error to give an instruction authorizing them to allow such damages as they might find fair and just with reference to the pecuniary injuries to plaintiff. The jury may consider whether the death was caused through negligence or was the result of a willful or wanton act and may assess the damages accordingly.

13. ———: ———: ———: **Pleading.** Where plaintiff seeks to recover the punitive damages allowed by section 5425, Revised Statutes 1909, the petition need not specify the section of the statute under which recovery is sought. It is enough that it contains a clear and concise statement of the facts constituting the cause of action.

Appeal from Greene Circuit Court.—*Hon. Alfred Page,* Judge.

REVERSED AND REMANDED.

*Robert T. Railey* and *Barbour & McDavid* for appellant.

(1) The deceased was a trespasser at the time and place of the injury. The evidence wholly fails to establish such open, known, free, extensive, continuous and nightly use of defendant's track at the place, and at the hour of the injury as to have required defendant's employees to be on the lookout for deceased at the time and place of his injury. No actual knowledge or acquiescence is shown. The burden of proving such use and knowledge rests on the plaintiff. R. S. 1909, sec. 3145; Frye v. Railroad, 200 Mo. 377; Rine v. Railroad, 88 Mo. 392; Barker v. Railroad, 98 Mo. 50; Carrier v. Railroad, 175 Mo. 471; Fearons v. Railroad, 180 Mo. 208; Hyde v. Railroad, 110 Mo. 272; O'Donnell v. Railroad, 197 Mo. 110; Hufft v. Railroad, 222 Mo. 286. (2) The use of a railroad track by the general public must have been a long, open, known, free, continuous and extensive use thereof before the railroad company can be held to have acquiesced in such use. Acquiescence cannot exist without prior knowledge. Frve v. Railroad, 200 Mo. 377; Fearons v. Railroad, 180 Mo.

224; Hufft v. Railroad, 222 Mo. 305. (3) The engineer did not see and could not have seen deceased before he was struck; and even if it be conceded—(which we do not concede)—that the engineer did fail to see and act on the first signal given by the brakeman or conductor, such failure would not be an act of negligence on his part as to the deceased. Hufft v. Railroad, 222 Mo. 303; Ninert v. Railroad, 135 S. W. 36, and cases therein cited. Under the facts in this case there is no room for the application of the humane doctrine. McGee v. Railroad, 214 Mo. 531; Hawkins v. Railroad, 135 Mo. App. 534; Degonia v. Railroad, 224 Mo. 596; Lennon v. Railroad, 198 Mo. 514; Veatch v. Railroad, 145 Mo. App. 232; Van Dyke v. Railroad, 230 Mo. 259; Haffey v. Railroad, 135 S. W. 987; Neas v. Railroad, 138 Mo. App. 504; Bennett v. Railroad, 122 Mo. App. 703; Rissler v. Transit Co., 113 Mo. App. 120; Boyd v. Railroad, 105 Mo. 371; Ries v. Transit Co., 179 Mo. 1; Markowitz v. Railroad, 186 Mo. 350; Roenfeldt v. Railroad, 180 Mo. 554; Reno v. Railroad, 180 Mo. 489. (4) In this case the deceased, without looking, suddenly stepped upon the track immediately in front of the approaching train and was, in an instant, struck by the car, and there can be no recovery. Bennett v. Railroad, 122 Mo. App. 711; Moore v. Railroad, 176 Mo. 528; King v. Railroad, 211 Mo. 13; Burde v. Railroad, 123 Mo. App. 634; Guyer v. Railroad, 174 Mo. 350; Maloy v. Railroad, 84 Mo. 274; Van Dyke v. Railroad, 230 Mo. 282; Clover v. Railroad, 140 Mo. App. 419; Kries v. Railroad, 131 Mo. 545; Kinlen v. Railroad, 216 Mo. 164; Harlan v. Railroad, 64 Mo. 482; Cole v. Railroad, 121 Mo. App. 613; Barnard v. Railroad, 137 Mo. App. 691; Tanner v. Railroad, 161 Mo. 510. (5) Even if it could be said that defendant's servants were guilty of negligence, the negligence of deceased was so concurrent in point of time and place that there was absolutely no opportunity for defendant to avoid the injury by any

means in its power. Maloy v. Railroad, 84 Mo. 270; Walker v. Railroad, 193 Mo. 543; Howelson v. Railroad, 157 Mo. 243; Watson v. Railroad, 133 Mo. 246; Sims v. Railroad, 116 Mo. App. 572; Boyd v. Railroad, 105 Mo. 371; Maxey v. Railroad, 113 Mo. 1; Barrie v. Transit Co., 102 Mo. App. 92; McCauley v. Transit Co., 179 Mo. 590; King v. Railroad, 211 Mo. 13; Deane v. Transit Co., 192 Mo. 575; Schmidt v. Railroad, 191 Mo. 215; Sanguinette v. Railroad, 196 Mo. 466; Hook v. Railroad, 162 Mo. 569; Holland v. Railroad, 210 Mo. 338; Porter v. Railroad, 199 Mo. 82; Boring v. Railroad, 194 Mo. 548; Van Dyke v. Railroad, 130 S. W. 7.; Laun v. Railroad, 216 Mo. 563.. (6) It requires more than a showing of a mere possibility that the accident might have been averted to bring the case within the operation of the last chance doctrine. Markowitz v. Railroad, 186 Mo. 358; Browning v. Railroad, 106 Mo. App. 729; McGee v. Railroad, 214 Mo. 542; Hawkins v. Railroad, 135 Mo. App. 535; Wilkersen v. Railroad, 140 Mo. App. 306.. (7) An instruction must be within the allegations of the petition and in addition thereto must be authorized by the evidence. Beave v. Transit Co., 212 Mo. 353; Black v. Railroad, 217 Mo. 687; Wilkersen v. Railroad, 140 Mo. App. 306; Henry v. Mining Co., 144 Mo. App. 350. (8) The court erred in giving plaintiff's instruction No. 2, over the objection of defendant, and erred in admitting over defendant's objection testimony as to the amount of money earned by deceased of which he was capable of earning as a moulder. Young v. Railroad, 227 Mo. 316; Childress v. Railroad, 141 Mo. App. 691; Gilkerson v. Railroad, 222 Mo. 206; Casey v. Transit Co., 205 Mo. 721; King v. Railroad, 130 Mo. App. 368.

*Hamlin & Seawell* for respondent.

(1) There was substantial evidence of the negligence of appellant and the verdict of the jury being based thereon is final. Chamberlain v. Railroad, 103

Mo. 591; Lynch v. Railroad, 111 Mo. 605; Morgan v. Railroad, 159 Mo. 279; Eppstein v. Railroad, 179 Mo. 720; Fearons v. Railroad, 180 Mo. 221; Ahnefeld v. Railroad, 212 Mo. 292; Everett v. Railroad, 214 Mo. 83; Cotner v. Railroad, 220 Mo. 289; Hawkins v. Railroad, 135 Mo. App. 524; Neas v. Railroad, 128 Mo. App. 504; Boyd v. Railroad, 105 Mo. 380; Cotner v. Railroad, 220 Mo. 298; Goff v. Transit Co., 199 Mo. 694; Murrell v. Railroad, 105 Mo. App. 193. (2) The failure to give signals of warning is in such cases evidence of negligence to be considered by the jury in determining whether the employees did all in their power to prevent the injury after they discovered or should have discovered the peril. Klockenbrink v. Railroad, 172 Mo. 690. (3) And signals of the usual and customary kind must be given, especially when backing a train through a populous city without a light in front. Morgan v. Railroad, 159 Mo. 262; Hinzeman v. Railroad, 199 Mo. 65; Smith v. Railroad, 129 Mo. App. 413; Lynch v. Railroad, 208 Mo. 1. (4) The instructions correctly declared the law and have been frequently approved by the apellate courts of this State. Murphy v. Railroad, 228 Mo. 72. (5) There was no error in appellant's instruction No. 2 or in admitting evidence of earning capacity of deceased. 8 Ency. Pl. and Pr. 259; Williams v. Railroad, 141 Mo. App. 631; Casey v. Transit Co., 116 Mo. App. 235; Crohn v. Telephone Co., 131 Mo. App. 318; Philpott v. Railroad, 85 Mo. 164; King v. Railroad, 98 Mo. App. 235; Marsh v. Railroad, 104 Mo. App. 577; Murphy v. Railroad, 228 Mo. 86; Tetherow v. Railroad, 98 Mo. 86; McKenzie v. Railroad, 216 Mo. 17; Schlereth v. Railroad, 115 Mo. 102; McCarty v. Railroad, 192 Mo. 400; Lee v. Railroad, 195 Mo. 428.

NIXON, P. J.—Plaintiff brought this action in the circuit court of Greene county to recover $10,000 for the death of her husband, George B. Ervin, alleged

to have been negligently killed by one of defendant's trains on the night of October 29, 1909, between seven and eight o'clock, while he was walking along and upon defendant's track in the city of Springfield. The trial resulted in a verdict and judgment in favor of the plaintiff for $6500, and defendant brings the case to this court on appeal.

The petition is as follows: (Caption omitted).

"Plaintiff for her cause of action against the defendant states that on the date hereinafter mentioned she was the wife of one George B. Ervin, and is at this time his widow, and that on said date the defendant was a corporation duly organized under and by virtue of the laws of the State of Missouri, and as such, owned, controlled and operated a railroad in Greene county and the city of Springfield, Missouri, and in the operation of said railroad used cars and locomotive engines propelled by steam.

"That Mill street is a public thoroughfare in the city of Springfield, Missouri, and extends east and west in said city, and that Benton avenue and the National boulevard are public thoroughfares of said city and extend north and south, and that the city in the vicinity of Mill street on either side, between Benton avenue and the National boulevard was thickly populated and numerous factories and shops had their place of business in said vicinity.

"That the railroad track and right of way of the defendant along Mill street and between Benton avenue and the National boulevard on said date were and had been, for a long time prior thereto, by and with the knowledge and consent of the defendant used by the public generally and especially pedestrians going to and from their places of employment in the vicinity of Mill street as a thoroughfare. Or that the defendant by the use of ordinary care could have known of said fact.

"That on the 29th day of October, 1909, between seven and eight o'clock p. m. of said day, George B. Ervin, the husband of plaintiff, while walking along said track or near same and using ordinary care, was struck by a train of cars and killed. That the death of the said George B. Ervin was caused by the negligence of the servants and employees of the defendant as follows:

"That they were in charge of a train composed of an engine and two cars, and that they were running the engine with the headlight and front end to the rear and pushing the cars in front of it in the direction they were going and that the said servants and employees failed to keep a lookout for persons on or near the track, or to place a light or signal upon the front of said car or to give the said George B. Ervin warning by ringing the bell or sounding the whistle or in any other manner of the approach of said train.

"And that the servants and employees of the defendant in charge of said train negligently operated it as aforesaid after they saw George B. Ervin or by the exercise of reasonable diligence could have seen him upon or near said tracks in this that without giving him any warning or signal as aforesaid mentioned, ran against, upon and over the said George B. Ervin and injured him so that he instantly died.

"Plaintiff says that by reason of the death of her said husband caused by the servants and employees of the defendant as aforesaid mentioned, she has been damaged in the sum of ten thousand dollars."

For another cause of action, the matter contained in the first three paragraphs of the first count is again set forth, after which the second count proceeds as follows:

"That on the 29th day of October, 1909, and between seven and eight o'clock of said day, the servants and employees of the defendant while in charge of defendant's engine and a couple of box-cars, neg-

ligently and carelessly ran said engine and cars against, over and upon, one George B. Ervin, the husband of plaintiff, and injured him so that he instantly died.

"That the negligence and carelessness of the servants and employees of defendant in the operation of said engine and cars was as follows: That they saw the said George B. Ervin on or near said track and in a place of danger a sufficient time and distance ahead of said cars to have stopped said engine and cars and prevented the death of said Ervin or by the exercise of reasonable diligence could have seen him, but, that after the said servants and employees saw the said Ervin or by the exercise of reasonable diligence could have seen him on or near said track in a place of danger they negligently and carelessly failed to stop said engine and cars and negligently and carelessly ran said cars against, upon and over the said Ervin injuring him and thereby causing his immediate death.

"Wherefore plaintiff says by reason thereof she has been damaged in the sum of ten thousand dollars for which she prays judgment."

To this petition, the defendant filed the following answer: (Caption omitted.)

"Comes now the defendant and for its answer to plaintiff's petition in the above entitled cause admits that it is a corporation, as alleged, and denies each and every other allegation contained in said petition.

"For further answer to the plaintiff's said petition, defendant alleges that if the said George B. Ervin was run over, injured and killed by defendant's engine and cars at the time and place alleged in said petition, then the injury and death of the deceased was the result of his own negligence and carelessness in going on and walking upon and across defendant's railroad tracks in front of the then approaching engine and cars without looking or listening for the approach

of said train on said tracks, and his own negligence and carelessness in so doing directly caused and brought about his alleged death.

"For another answer to the plaintiff's said petition, defendant alleges that if the said George B. Ervin was run over, injured and killed by defendant's engine and cars at the time and place alleged in said petition then the injury and death of the deceased, who was not connected with or employed on defendant's railroad, was the result of his own negligence and carelessness in going upon and walking on and across the tracks of the defendant at a place where the same were not laid upon or along a publicly traveled road or street, or through or over a highway or road crossing, without looking or listening for the approach of trains, in violation of section 1105 of the Revised Statutes of Missouri.

"Wherefore, having fully answered plaintiff's petition herein the defendant prays to be discharged with its costs in this action laid out and expended."

The evidence at the trial tended to show the following state of facts:

The deceased was killed in the city of Springfield on the defendant's railroad track some seven hundred and fifty feet east of Jefferson street which runs north and south through the city. Such railroad comes into the city in an easterly direction to a connection with the railroad tracks of the St. Louis & San Francisco Railroad Company near the eastern city limits. Defendant's tracks cross Jefferson street and Milligan alley, hereinafter referred to, practically at right angles. The distance between Jefferson street and Milligan alley is about twelve hundred and eighty feet, and in that distance, there is no street, alley or crossing of any kind over defendant's railroad tracks. Between these two points, defendants has two railroad tracks—double tracks—nine feet apart. These tracks and the space between them are ballasted with chats.

The space between the two sets of tracks is somewhat lower than the top of the tracks. These tracks are on the private grounds of the defendant. There is not and never has been any street where these tracks are located, and no street or crossing of any kind intersects them between Jefferson street and Milligan alley, as we have stated. Th tracks were constructed something like two or three years prior to the happening of this accident. On the south of these tracks, beginning about five or six hundred feet east of Jefferson street and extending on east to Milligan alley, is a hill or embankment, made by the cutting down of the hill for the railroad tracks. This embankment ranges in height from fifteen to eighteen feet in places, and running down to nothing at Milligan alley. Milligan alley is quite low, being between a hill on the west and another on the east. On both sides of defendant's right of way, and along this hill or embankment, there were trees, extending up to Milligan alley and to the Sterling Iron Works, located just east of Milligan alley and a short distance north of the tracks. There were no houses or shops of any kind along these tracks, or right of way, at the place where the accident occurred. The St. Louis & San Francisco Railroad Company's tracks also ran through this section of the city, some distance north of defendant's tracks. The place where Ervin was killed was an uninhabited, rough and unoccupied section of the city. There were no public light or lights of any kind after night in the immediate neighborhood. It was given up entirely to railroad yards, constructed and operated on private grounds. There were no worn footpaths on or along these tracks at any place between Jefferson street and Milligan alley; nor were there any fences along the right of way.

On the evening of October 29, 1909, defendant's train came into Springfield at 6:30 o'clock, and after doing some switching at the depot which is located

several blocks west of Jefferson street, the train crew proceeded to deliver a loaded car to the St. Louis & San Francisco Railroad Company on the connection in the eastern part of the city. This train, as it proceeded eastward, consisted of an engine, a caboose, and the loaded boxcar. The engine with its headlight was pointed east, the direction in which it was moving; next east of the engine was the caboose—next to the headlight of the engine, and east of the caboose was the boxcar, it being the front or head car as this train proceeded eastward. The conductor and brakeman, each with a lighted lantern, were standing on top of the boxcar near the east end—front end—looking ahead. Two other persons, Stone and McCulley, were standing a few feet back of the conductor and brakeman on top of this forward car, and two other men were standing near the cupola on the caboose. The engineer and fireman were at their posts on the engine. The engineer whistled for street crossings, including Jefferson street, and the brakeman flagged them, and the fireman, as shown by defendant's evidence, kept the bell ringing all the time.

The petition alleges that the killing of plaintiff's husband was caused by this train and occurred between seven and eight o'clock p. m., and the evidence all justifies it, but the exact time is not shown. The night was dark, or was becoming dark. There were no interesecting streets east of Jefferson,—between Jefferson and the place where the accident occurred. The train was running about four or five miles an hour according to the judgment of the witnesses.

The defendant's evidence tends to show the following state of facts immediately before the killing of Erwin: After the train had run several hundred feet east of Jefferson street, on the north track, near the embankment described, the conductor and brakeman saw a man about a car's length ahead of their car walking slowly eastward between the north and south

tracks, in a place of safety; but soon after they first saw him, he started in a northeasterly direction to go upon the track on which the train was approaching, seemingly with the view of crossing that track. Both the brakeman and the conductor immediately, as they testified, commenced to halloo as loudly as they could to warn the man on the track, and about the same time the brakeman gave a stop or washout signal with his lantern to the engineer. Ervin seemingly paid no attention to them or their warning and evidently did not know of the approach of the train. Mr. Ervin was very deaf and had been for many years, but he could hear sharp and shrill sounds. None of this train crew knew him, nor did they know he could not hear. The engineer, according to defendant's eye-witnesses, immediately responded to the signal and "made a good quick stop." Their testimony was to the effect that when Mr. Ervin stepped onto the north track he was only about half a car's length—eighteen to twenty feet—away from the forward car; he was so close to it that the view of him by the brakeman and conductor was at once shut off by the end of the car, although they were standing within two or three feet of the east end of it; he had not reached the center of the track when sight of him was lost. They testified that the train was stopped suddenly and that everything possible was done to save the unfortunate man. When the train was stopped, Mr. Ervin was found lying across the north rail of the north track, and only about one-third—twelve feet—of the front car—the front trucks of the car—had passed over him. The evidence all tends to show that the engineer could not and did not see Mr. Ervin and did not know of his presence until after the accident had occurred. Two other witnesses (Stone and McCulley) who were on the front end of the forward car with the conductor and brakeman, saw Ervin, and also shouted a warning to him. There were no other witnesses who saw Mr.

Ervin at all on the night of the accident until after it had occurred. The first time he was seen on the right of way that night was when he was seen by the conductor and brakeman, and he was about thirty-six feet ahead of the train, in a place of safety, some four and one-half or five feet south of the main track. How he came to be there upon defendant's right of way, no one testified.

In order to present the case as made by the defense more fully, and as illustrative of the evidence in the case, we insert, in substance, the testimony of the conductor, brakeman, engineer, and others.

E. H. Hogue stated that he was a freight conductor in the employ of the defendant company; that he remembered the killing of George B. Ervin, at which time he was in charge of the train; that he registered the train at the depot at 6:30 p. m., and went east across Jefferson street at 6:45; that the train was composed of a caboose and emigrant car, and the caboose was between the engine and the emigrant car. The engine was fronted east, the emigrant car being on the east end of the train and the engine being in the rear and pushing the caboose and car toward the east. After we crossed Jefferson street, the train was traveling about five miles an hour. I was at that time on top of the front car. Mr. Bonham, and Mr. Stone and a young man named McCulley, were there also. We flagged the crossings between the depot and the crossing at Jefferson street. Somewhere eight hundred feet east of Jefferson street, we saw a man walking along between the double tracks. We were using the north track. He was walking between the two tracks, to our right. It was dark; the moon was not up. We first saw him walking between the tracks a car's length ahead of us. In a short time he started to get on the track on which we were approaching. We gave the stop signal and the engineer applied the air and stopped as soon as possible, but it

struck the man before the train stopped and one pair
of trucks passed over his body. At the time he started
across the track on which we were moving, he was
about half a car's length ahead of us. During all this
time we were looking ahead in the direction the train
was moving. We gave stop signals—Mr. Bonham and
myself—as soon as we saw him start across on the
main track. He gave no heed and paid no attention
to our warning cries. After the first signal was given,
we knew he had stepped upon the track, and we were
so close to him that the end of the car hid him from
my observation and I couldn't see him. Neither the
brakeman nor myself left the front end of the car.
Neither of us used curse words towards the engineer.
I don't think the train ran over half a car's length
after the signal was given. I have been railroading
twenty years. I have never noticed anyone up along
that track before at night; I have been on the track
several times. The bell was ringing and had been
ringing ever since we left the depot, up to the time
the accident occurred. We called to the man on the
track as soon as we saw him—at the time the signal
was given. He paid no attention. We were not ac-
quainted with the man; never saw him before. There
were trees just beyond the place where the accident
occurred, on both sides of the tracks. The length of an
emigrant car is from thirty-four to thirty-six feet. I
was a car's length from him when I first saw him.
The space between the rails of the track was some
four feet eight inches, and the distance between the
two tracks was about nine feet. At the time, I was
standing on the running board about the middle of the
car. Bonham, the brakeman, was also standing on top
of the car with one foot on top of the grab-iron of the
ladder and the other on the running-board, to the
right of me. The engineer was on the right side of the
cab in the engine. Bonham gave the emergency signal
and swung out so the engineer could see him, with a

quick movement, which meant to stop the train. The headlight of the engine was up against the caboose at the time, and the emigrant car was being pushed down in front of the caboose and engine. The signal was given by the brakeman with a lantern. After the signal was given, we stopped within about eighteen feet, and the engineer made a good stop.

W. G. Bonham testified that he was the brakeman on this train and had been in the train service nine years; that the train was made up as stated by the conductor; that there were on top of the car, besides himself, the conductor, and a man named Stone, and two others back of him. The conductor was just behind me on top of the car when we crossed Jefferson street. After leaving Jefferson street, I took my position on the front end of the forward car between the running-board and the edge of the car, and stood there and looked ahead. When I first saw this man, he was something like a car's length or so ahead of us, walking between the double tracks, and he immediately started to walk across the main track in a northeasterly direction. When I saw him make this move I commenced to halloo to him, and gave the signal to the engineer—the stop signal. I called as loud as I could, and the stop signal was given at about the time I called to him and was given with a lighted lantern. When I gave the signal, the engineer applied the air and I felt the effect of the air on the brake valves. After the signal was given, the man passed over into the middle of the track on which we were approaching and I didn't see him any more; didn't see him when the car struck him. I was standing on the end of the car, on top, giving the signal. After he walked in between the rails of this main line where we were, I didn't see him any more. I kept signaling the engineer until we stopped; he answered the first signal. I continued to halloo until we hit this man. We stopped

directly. after we hit him. The body was right behind
the front trucks on the north side of the track; per-
haps one-third of the front car had passed over him.
As to the character of the night, I couldn't say wheth-
er it was a real dark night, but you couldn't see a man
very far away. The sun was down, our headlight and
lamps were lighted, and it was dark. The place where
the man was struck was a dark part of the track; don't
know of any street lights or lamps with the exception
of the lights we had on the train. The bell was ring-
ing from the time we left the depot. We whistled at
each crossing and stopped, and there were three or
four crossings. The engineer answered the first dan-
ger signal I gave him. My estimate is that the man,
when we first saw him, was some twenty feet ahead
the car—that is, when I gave the signal. Perhaps he
was something less than a car's length ahead yet when
I first called to him—signaling and hallooing at the
same time. The train was running at the time about
five miles an hour. Neither when I first saw the man
nor at any other time did I cry "Hey! Hey!" nor did
I shout a signal to the engineer to stop. The engi-
neer did pay attention to the signal that I gave. I
did not turn around and run back on the car towards
the west. I did not say, "G-d d-it, we are running
over a man! Can't you see or hear anything!"
Nothing of that kind occurred.

Harry Gerricke testified that he was the engineer
on the engine at the time of the accident; that it oc-
curred about seven o'clock, east of Jefferson street,
at which time the train was running about five miles an
hour. The engine was properly equipped with brakes,
and belongs to the 2600 class of engines. I was lean-
ing out at the time, at the right hand side, watching
the brakeman and conductor who were ahead on top
of the front car; I was watching their lights. The
fireman was in his place, ringing the bell. When east
of Jefferson street, I received a stop signal from a

man on top of the car ahead and I stopped. The signal was what we call washout or emergency signal. I was watching for a signal all the time. I shut off the steam, applied the air, worked the reverse lever, and the train was brought to a stop. I did not see the man on the track and do not know where he got on. When the signal was given, I did not know it was on account of a man being on the track and did not know the purpose of it, but I did act promptly and responded to the signal as quickly as I could. I thought we were on a derail and I wanted to get stopped as soon as I could, but I had no knowledge of a man being on the track. Signals are generally made to an engineer with a lantern after night. I was looking for a signal at the time the one in question was given, and I responded to it as soon as I could. I could not say how far the car ran after I received the signal; I couldn't tell the exact feet or distance that I ran after I received the signal.

J. B. Stone testified that he boarded the train at the depot; that he was on the running-board on top of the forward car. The trainmen got off and flagged each of the several crossings. After we left Jefferson street, going east, we were all on top of the forward car. The first thing I knew, I saw a man step onto the track in front of the train. The brakeman and conductor hallooed, and the brakeman gave a signal. I then stepped back and lost sight of the man; the last I saw of him, he was about a car's length ahead between the rails of the main track. The signal given was a stop signal; the signaling and hallooing were all together. The engineer responded to the first signal that was given and the car then came to a stop.

Dave Hickman testified that he was on top of the caboose at the time of the accident. The caboose was between the engine and the front car. I was right on top leaning against the cupola. I did not see the man on the track. The first thing that attracted my atten-

tion was the shouting, and then I saw a signal to stop, and then they stopped. The stopping of the train caused it to jar; I thought it was a pretty sudden stop; an awful jar I know; when it stopped it threw me over against the cupola. I saw the signal given; I saw the lantern; and the engineer responded to it just as quickly as he got it. I was looking towards the engine—looking the other way. He stopped awful sudden; it seemed to begin to stop at the time the signal was given,—right about the same time.

The defendant introduced several expert engineers, and an air-brake inspector, who testified as to the distance such a train would travel after a stop signal was received, taking into consideration the rate of speed, the grade of the track, the size of the train, and the class of engine, equipped, as this was, with Westinghouse brakes.

Robert Wark, the air-brake inspector, testified that from the time the brake is applied, such a train could be stopped within fifteen or eighteen feet; couldn't tell exactly; that it would take seven seconds from the time the brakeman commenced to give the signal until the brakes would be on.

J. W. Fitch, an egineer for eighteen years, in answer to the hypothetical question, stated that such a train would travel after the brakes became effective fifteen feet, and that it would take two seconds to make and receive the signal. It would not be possible, from the time the signal was given, to stop it in thirty or thirty-six feet; the train would go farther than that.

George E. Dillard, for twenty-three years a railway engineer, stated that it would take a couple of seconds from the time the signal was given before the engineer would understand it. After the brakes became effective, the car would move fifteen feet before it could be stopped. From the time the brakeman commenced to give the signal until the car was stopped, it would run perhaps something like fifty feet.

J. E. Dulin, who had been an engineer in charge of a locomotive for twenty-eight years, stated that such a train would run, after the signal was given, forty-five or fifty feet.

William Tull, for fifteen years a locomotive engineer, stated that from the time the brakeman gave the signal to the time the train would be stopped, it would run some forty-two feet.

J. C. Odom, a witness for the plaintiff, testified: I went down to where Mr. Ervin was killed that night. The brakeman was there with a lantern and used this language: "There was no use of that man being killed; if the engineer had paid attention to his signal he would not have been killed."

Charley Adams, another of plaintiff's witnesses, testified, in substance, as follows: "I remember about a man being killed (they said his name was Ervin) in October, 1909, at Springfield. I was walking down this railroad track just before he was killed, right east of Jefferson street. When I had come to that street, the train passed me, going east. The engine was pushing the box-cars. After the train passed Jefferson street, they stopped (up east of Jefferson), and I passed right along by the train while it was standing on the track. I was going east. There was a man lying there; I supposed he was dead. I passed on by the engine. I have seen trains moving frequently; this train, from the time it crossed Jefferson street until it stopped, was moving at a speed of about four miles an hour. I never heard any bell ringing and never heard a whistle until after the train stopped. I went right by the train. It was then beginning to get dark a little—that is, dusk. I would not say which track the train was on; think it was on the north track. I saw one man standing on one of the box-cars—on top of it—and he had a lantern in his hand. I saw only one man. The train was standing still when I saw the man lying there. I did not stop where the man was

lying; went right on. Don't know how long the train had been there. I saw a man standing there with a lantern, and some people farther back.

Bertie Ervin as a witness in her own behalf stated that she first learned of the accident about half an hour after it occurred. Mr. Ervin was brought to the house dead. He was forty-five years of age. He was working at the time at the Woods-Evertz Stove Company as an iron moulder. He worked by the piece, his wages averaging from $100 to $110 a month. He spent all his money at home for the support of the family. I have seen him walking on this track; he walked on it all the time; would go to work at six o'clock in the morning and return at seven in the evening. He was industrious and sober. He was rather hard of hearing; had a trumpet but had not used it for a year. I never used the trumpet to talk to him. He could hear sharp or shrill sounds; he could hear a bell ringing. I advised him not to walk on the track. He had been walking on defendant's track ever since it was built. I told him not to, but he always said he was not a bit afraid because he had walked the track so long. The members of the family, and his father, asked him not to walk on the track.

H. E. Gubenator, an expert witness for the plaintiff, was asked whether he was familiar with engines of the 2600 class and with the usual appliances for stopping trains, and he answered that he was. The hypothetical question, substantially as propounded to defendant's expert witnesses, was propounded to him and the other expert witnesses for the plaintiff, except the question was as to how long it would take to stop the train on a two per cent grade, going at the rate of four or five miles an hour; in other words, in what distance such a train could be stopped. This witness answered that such a train could be stopped on such a track in twelve feet, with the usual appli-

ances. He also stated that a danger signal meant to "stop right off—it means stop."

C. E. Cook, a locomotive engineer for twenty years, said he was familiar with the grade and the location of the track where Mr. Ervin was killed; that with a train of that size, going east, with the emigrant car in front, at the rate of five miles an hour, when the rails were dry and the weather was dry, with the usual appliances of engines on that road, it could be stopped in ten or twelve feet.

The court gave the following instruction for the plaintiff:

"1. If the jury find and believe from a preponderance or greater weight of the evidence that George B. Ervin, at the time he was killed was the husband of the plaintiff, and that this suit was brought within six months after his death, and shall further find from the evidence that the said George B. Ervin was walking in an easterly direction upon or dangerously near the track of defendant and in a perilous position, and if you further find that the train of defendant was running in an easterly direction on said track with a caboose and car of said train further east and in front of the engine, and if you find that an employee of defendant was in such a position on said car that he could keep a lookout ahead, and that he had a lighted lantern at the time by which he could signal the engineer of said train in such a manner that such engineer could by the use of ordinary care and prudence see and understand said signals and govern the movement of said train accordingly, and if you find that said employee on said car aforesaid saw the perilous position aforesaid, of the said George B. Ervin and used ordinary care and prudence to warn him of the approach of said train, and if you further find that the said George B. Ervin did not heed said warning and was unaware of its approach and of his perilous position, and that said employee on said car sig-

naled the engineer operating said engine to stop said
train, and that such signal was so given in time that
said engineer could have stopped said train by the
use of ordinary care and prudence with such instru-
mentalities that were then and there at his command,
and the injury and death of the said George B. Ervin
thereby avoided, and if you further find that the said
engineer negligently and carelessly failed to observe
said signal or if you find that he observed said signal,
and thereafter failed to use ordinary care and pru-
dence to stop said train and thereby prevent said in-
jury to the said George B. Ervin, and that by reason
of such negligence and carelessness and omission of
duty as aforesaid, the said train struck and killed the
said George B. Ervin, and if you further find that the
track where he was killed and for six hundred feet
west or more thereof, at said time of day or night,
had been used for several years with the knowledge,
consent and acquiescence of the defendant, its ser-
vants, agents and employees by persons walking
thereon to and from their work and home, then you
will find for the plaintiff, although you may believe
that deceased was guilty of negligence in being upon
or near the track of defendant and in permitting him-
self to be inattentive to the danger surrounding him,
and in going upon said track without looking or listen-
ing and in being on said track when his hearing was
impaired, and after being warned to stay off of said
track by plaintiff.

"And by ordinary care is meant such care as an
ordinarily careful and prudent person would exercise
under the same or similar circumstances.

"2. If you find for the plaintiff, then in assessing
her damages, you may give her such damages as you
may deem fair and just with reference to the necessary
pecuniary injury resulting to her from such death,
not less than two thousand dollars nor more than ten
thousand dollars."

The court gave the following instructions for the defendant:

"1.   The jury is instructed and cautioned that in weighing the evidence you should not be influenced by the fact that the plaintiff in this case is the widow of the deceased, George B. Ervin, and that the defendant is a corporation. You should weigh the evidence and be governed by the instructions in the same way, and by the same rules as you would were the issues herein between two individuals.

"2.   The jury is instructed that in considering this case they should not indulge in any mere suppositions or speculations as to what might or might not have been done or occurred at the time and place when and where George B. Ervin was struck and killed, but you must decide the case upon the evidence and the instructions of the court.

"And the court instructs the jury that they are the sole judges of the credibility of the witnesses, and the weight to be given their testimony, and in weighing the testimony, the jury may take into consideration not only what they have testified to, but also their manner of testifying, and their ability at the time to clearly see what occurred, and how to clearly recall and relate the facts, and, if the jury believe from the evidence that any witness has knowingly sworn falsely to any material fact, then the jury may disbelieve the whole or any part of such witness' testimony.

"3.   The court instructs the jury that the defendant is not an insurer of the safety of persons who go upon or attempt to walk across its railroad tracks, and the mere fact that the deceased, George B. Ervin, may have been injured and killed by defendant's train or cars will not justify a verdict against the defendant.

"Before you can find a verdict in this case for the plaintiff, you must find and believe from a preponderance or greater weight of the evidence, that

plaintiff's (deceased's) injury and death was caused solely by negligence on the part of defendant's servants in charge of the train."

The defendant requested and the court refused to give the following instructions:

"4. You are further instructed that, if you find and believe from the evidence that the deceased, at the time of his injury and death, was partially deaf or hard of hearing, then it became and was his duty, in approaching or in going upon or across the track of the defendant's railroad, to exercise a higher degree of diligence in looking for approaching engines or cars. And you are instructed that, under such circumstances, this duty was a continuing one, so long as the said George B. Ervin remained upon said tracks, or so near thereto as to be likely to be struck by engines or cars passing thereon. And, if you shall believe and find from the evidence that the deceased, George B. Ervin, was upon said railroad tracks, or so near thereto, as to be likely to be struck by engines or cars passing thereon and failed to look for such engines or cars thereon, and, if you further find that such failure to look caused or directly contributed to his death, then your verdict must be for the defendant.

"5. If the jury find from the evidence that the deceased, George B. Ervin, went upon defendant's railroad tracks at the time and place he was struck and killed without looking or listening for the approaching train, if you find from the evidence he could have seen or heard the train if he had looked and listened for it, then his act in so going upon the tracks was negligence on his part, and if you further find from the evidence that his negligence directly caused or contributed to his injury and death, then the plaintiff cannot recover in this case, and your verdict must be for the defendant.

"6. If the jury find from the evidence that both the deceased and the defendant, through its servants,

were guilty of negligence at the time and place of the injury, and that the negligence of both contributed directly to produce the injury and death of deceased, then the plaintiff cannot recover in this action and your verdict must be for the defendant.

"7. The court instructs the jury that even though defendant's servants in charge of its train which struck and killed the deceased saw, or, by the exercise of ordinary care, might have seen the deceased walking near to and approaching defendant's railroad track, yet in such event they had a right to presume that the deceased saw or would see the approaching train, and that he would keep off the track and not go upon them in front of the approaching train, but that he would stop and remain in a place of safety until the train passed by; and, under such circumstances, those in charge of the approaching train were not required to check the speed of the train or to give the deceased any warning of its approach.

"8. The court instructs the jury that it was the duty of the deceased, George B. Ervin, before going upon the defendant's railroad track, to look and listen for approaching trains, for the purpose of avoiding injury by them. And, if at or before the time he went upon said track he could have seen or heard the approaching train, by looking and listening, and might have stopped his progress or stepped out of danger and avoided his injury and death, and did not do'so, then he was guilty of contributory negligence.

"And if you find from the evidence that the deceased, George B. Ervin, just before or at the time he went upon defendant's railroad track into a place of danger, could have seen or heard the approaching train if he had looked and listened therefor, and could thus have avoided being struck and injured by said train; and if you further find from the evidence that the deceased, George B. Ervin, went upon said track into a place of danger, without first looking and listen-

ing for the approaching train, and was within a few seconds thereafter struck by said train, then the deceased was guilty of such contributory negligence as to preclude a recovery by the plaintiff in this case, and your verdict must be for the defendant.

"9. The court instructs the jury that the deceased, George B. Ervin, when walking on, along or across defendant's railroad track, if you find he was so walking, was bound to use ordinary care and diligence to protect himself from injury from approaching trains on said track; and if you find from the evidence that he did not use such care and diligence in proceeding on, along or across the defendant's track, and that by reason of such failure to use such ordinary care and diligence, he was struck by defendant's train or car, and killed, your verdict must be for the defendant.

"You are further instructed that the term 'ordinary care and diligence,' as used in the above instruction, means that degree of care and diligence which would be employed by an ordinary prudent man under the same or similar conditions and circumstances as those in which the deceased, George B. Ervin, was at and just before the time of his injury.

"10. The court instructs the jury that as to the deceased, George B. Ervin, the engineer in charge of defendant's engine that pushed the car over or against said deceased, was not required to be on the lookout for stop signals, and was not required to stop his engine until he actually saw such signals; and, if you believe and find from the evidence that as soon as the said engineer saw said stop signals, he did all that a reasonably skillful and prudent engineer would have done to stop his engine and cars, and stopped them, your verdict must be for the defendant.

"11. If the jury find from the evidence that the deceased, George B. Ervin, stepped upon the north track of defendant's railroad in front of the engine and

tender approaching thereon from the west, and was immediately thereafter struck by said train, then your verdict must be for the defendant."

To show the extent to which the defendant's railroad tracks from Jefferson street east to Milligan alley had been used by the public as a pathway, plaintiff offered some ten or more witnesses, and the following is the substance of the testimony of several of these witnesses:

J. L. Butler stated that he remembered the killing of Mr. Ervin in October, 1909. I was a night-watchman and resided at the old Sterling Iron Works. I know about the place where he was killed. I have been acquainted with defendant's tracks ever since they were built, some two or three years. I have frequently seen pople using these tracks by walking on them and have used them myself. The track was ballasted up smooth and nice. I frequently saw people use it,— every day, in fact. I couldn't say how many; I saw people going up and down there every day while I lived there; I never counted them. I know of some young women who used that track regularly; they worked at the laundry; they would go to work about seven o'clock in the morning and return about six in the evening. People were going up and down there most all the time—most any time from seven till twelve at night. They were men who lived in the Boulevard addition, I suppose, going to town and coming back at night. I would see them using the track in the day time and night time. I saw Mr. Ervin using the track a few times. The condition of the track between the point where Mr. Ervin was killed and Jefferson street is that of a straight track, the distance being about two and one-half blocks and about three hundred feet to the block. For about one hundred yards, the track was straight east and west from where he was killed. Down about the iron works on the track where Ervin was killed, it is rather dark; it is a dark section

of the city; there is one light there by the board at Clinton street, which was a block and one-half east of where the accident occurred. The killing occurred about two or three hundred feet west of Milligan alley.

John Henneke testified for the plaintiff that he was acquainted with the place where Mr. Ervin was killed. I have been acquainted with the tracks ever since they were built,—three or four years. There are two tracks. I have seen people walking up and down, back and forth, and have walked it myself many times; ever since the ballast has been there,—about three years; ever since the road was built. The people I have seen walking on the main track have been going both ways, some east and some west. These people were working at the United Iron Works, the wagon factory, and other factories; I know of several men who worked at the wagon factory coming up and down that track. I have used the track to walk on frequently, ever since it has been there. I have observed engines of the railroad company down there and also men walking on the track while they were switching back and forth. I have seen them walking there morning and evening. I was never along there after night except on one or two occasions.

John Foote, another witness for the plaintiff, stated that he had resided on Clinton street for seven years, and that Ervin had lived about half a block north of him. I have known defendant's track ever since it was built. I have observed people using the track at the place where Mr. Ervin was killed, going up and down there between Jefferson street and the Sterling Iron Works. Almost every day I am down that way and I see people pass up and down the track. I used the track from Clinton street to Jefferson street prior to the time of the accident, but not often,—possibly once a month. Taking all the times together, I have seen lots of people use that track; I judge I have seen from one to fifteen at a time walking in different

directions up and down the track between Clinton street and Jefferson street, ever since the ballast has been there,—about a year, the best I recollect, before the killing. I don't know anything exactly about the use of the track by pedestrians at night time. There was an embankment along there where the accident occurred, where the road was cut through the hill, and there were some trees on this embankment; there were some trees along there.

W. H. Hunter also stated that he had known defendant's track for about two years prior to the time Mr. Ervin was killed at the point between Jefferson street and the Sterling Iron Works. I know about persons walking on the track and using it prior to Mr. Ervin's death. I have seen lots of people walking up and down the track, night and day. I traveled up that way myself, both night and day, off and on for two years; some twelve or fifteen times, both at night and day; go on at noon and come off at twelve o'clock at night. The men I met seemed to be working men as some of them had dinner buckets and baskets. Sometimes there would be one, other times, three or four. I have seen engines switching there at the time these people were passing up and down the track and have been there myself at such times. I couldn't give the names of the people.

G. W. West testified: I lived close to defendant's track. I have frequently seen people using that track and have used it myself at all times of the day and all hours of the night. I would be up town and it was my nearest way home. I saw people using it of nights. Saw women walking on it at night. My wife walked on it at night and also in the day time, and I have been with her at such times. I saw people come down Clinton street and then down that track; they would go both ways after they got on the track; many would turn towards Jefferson street. It was thickly settled over the hill at Clinton street.

Eliza West testified that she was acquainted with defendant's track where Mr. Ervin was killed and that she had seen persons using the track, walking up and down; saw women and children using it—walking on it—at night. I have walked it going to church. This was before the accident.

Bertie Ervin, widow of the deceased, as a witness in her own behalf, testified: I have seen persons walk up and down the track frequently at the place and west of the place where Mr. Ervin was killed, and we would go up and down there in going to Battlefield at night. I met people on the track prior to the accident when I was going up town.

Plaintiff's witnesses, G. W. West and Eliza West, his wife, testified as to the circumstances surrounding the accident, and it is deemed necessary to set forth the substance of their testimony.

Eliza West stated that she remembered the time when Mr. Ervin was killed; that it was about 7:15 o'clock in the evening, in October, 1909. At that time we were living in a house about two hundred yards, as near as I can tell, from the place where the accident occurred,—south of defendant's tracks. I was standing on the north corner of the porch. My husband at the time was farther around chopping the wood for night. I was looking toward the Sterling Iron Works at the time, straight down the track. I heard a man halloo. The hallooing seemed to be back west from where I was. I looked, and when I looked I saw a man waving a lantern. He turned and was going from the east end of the train to the west end,—he was going west on top of the car, hallooing. When I first saw him, he was waving his lantern slow, and then commenced waiving it fast, hallooing as he went, and was hallooing all along; at the same time he was going toward the west. "Q. When he was going along there west with the lantern and waving a signal, tell the jury what he was saying? A. He was saying, 'Hey!

Hey! Can't you see or hear nothing!' When he got
to the engine, when the engine stopped, he says, 'Can't
you see or hear me! Can't you see this lantern or
hear me! You have run over some one' Q. He was
still on top of the car when he said that? A. Yes,
sir; I couldn't see him when he got down. Q. You
say he was running west on the car when he made that
statement? A. Yes, sir. Q. Did he use any profane
language when he was running back west on the car?
A. Yes, sir, when he was running, hallooing, 'Hey!
Hey! Can't you see or hear nothing!' Q. Tell the
jury what he said? A. He says, 'G-d d- you, can't you
see or hear nothing!' When the car had stopped I
went down. I think I was the first one to see the de-
ceased. He had his head on the north side of the track.
His head was closer to the ties than his feet. Q.
Who was around there? A. A gentleman standing
·there and a man with a lantern. He came rushing
up and held the lantern up and asked if I knew the
man. I says, 'I don't.' I said, 'That is too bad,' and
he made me an answer—. The car was a loaded car;
looked like it might be goods. I stayed there till·
the man died. While I was down there I saw the brake-
man who made this statement: 'There was no use of
that man being killed; if the engineer had paid atten-
tion to his signal he would not have been killed.' He
made substantially that statement to me. I learned
afterwards the man was Mr. Ervin. Q. Did you hear
any bell ringing before the accident occurred? A.
Not that I remember of. Q. Were any whistles
blown? A. I couldn't say for sure whether I heard
any bell ringing. Q. Did you hear any whistle blown?
A. No, sir, there was no whistle blown.''

G. W. West testified: I worked at the Spring-
field Planing Mill. Mr. Ervin was killed in October
last, I think; I remember the time. At that time I
lived right on the hill, just on the other side,—505

Milligan alley. My house where I lived was higher than the track; set back on the hillside, on the west hillside; the hill sloped to the west. Just before Mr. Ervin was killed, I was at my woodpile preparing wood for the night. This woodpile was located in front, and kind of at the bottom of the hill. I was cutting wood. No one was with me at the time. One of my boarders had started off and I had been talking with him. At the time of the accident, I was looking toward the northwest. That would be in nearly a direct line with the place where Mr. Ervin was killed. The first thing I saw was the brakeman on the car. "Q. Which end of the car was the brakeman on? A. East end of the car. Q. Now tell the jury what you saw the brakeman do and what he had? A. He had a lantern in his hand. The first I saw, he gave his slow stop signal as any other man would do trying to stop a train. Q. Describe the signal to the jury? A. He just done about like this—(indicating). Q. A slow stop signal? A. That's what it was, a slow stop signal. Q. After you saw him give the slow stop signal, what did he do? A. The engineer didn't notice it, and he gave it to him fast and then he didn't notice it, and then the brakeman went to hallooing, and he didn't seem to pay any attention to that. Q. The engineer didn't? A. No, sir; and he turned on top of the car and started back towards the engine still giving him the signal. Q. Tell the jury what he did A. He was running back there hallooing, and he hallooed and says, 'Can't you see or hear nothing!' Of course he cussed. Q. Tell what he said? A. He said, 'G-d d- you, can't you see nothing or hear nothing at all! You will run over somebody!' Q. He was running back toward the engine on top of the car waving his lantern? A. Yes, sir. Q. What did you see next after he hallooed that out and waved his lantern? A. The next thing, I couldn't see what they were doing; he finally got the signal and shut off the

steam and stopped his engine. Q. How far had he gone back on that car? A. I suppose just about to the other end. Q. Going to the west end? A. Yes, sir. Q. What was it about the steam? A. He cut his steam out; he reversed his engine; I don't know whether he reversed it; he stopped his steam. Q. How can you tell? A. You can hear the steam when they are using it and you can tell just when they cut it out; it stops the noise and stops the pulling. Q. You saw the brakeman give the first signal and repeat the signal and then he started back hallooing, and finally got him to notice the signal, and you heard the steam shut off? A. Yes, sir. Q. What occurred after that? A. I could see, the brakeman started down, his lantern went out of sight, and I couldn't see him any more. Q. State to the jury why you couldn't see the brakeman when he started to go down? A. Because he was in behind the point of that embankment or cut. Q. Did you see Mr. Ervin on the track? A. No, sir. Q. Why? A. Because the bank was in the way between me and him. Q. You could see the brakeman? A. Yes, sir; see him on the car. Q. Now, Mr. West, from the time you first saw the brakeman give the first signal, up to the time that the train came to a stop, state to the jury about how far the train had gone? A. I suppose it had run about the length of three rails. Q. What is the length of a rail? A. Some are twenty-five and some are thirty-three feet and some are longer. Q. What would you think the length of those was? A. Thirty-three. Q. That would be about ninety-nine feet from the time he gave the first signal up to the time the train stopped? A. Yes, sir. Q. You say you first saw the brakeman on there with the lantern? A. Yes sir." I have done railroad work—track work—and have frequently observed trains on the track moving. I am now thirty-seven years of age. I have noticed moving trains on tracks for twelve or fifteen years,—ever since I was

nine years old,—and have worked on the tracks. I should think this train was moving at the rate of four or five miles an hour. "Q. You know the place where Mr. Ervin was killed? A. Yes, sir. Q. You saw it that night? A. Yes, sir. Q. Now taking the track from the point where he was killed, back west to Jefferson street, tell the jury what condition it was in with reference to being straight. A. The track was in very good shape. Q. Whether it was straight? A. It was a straight track. Q. Nothing there to obstruct the view of a brakeman or engineer? A. No, sir. Q. Or anybody else? A. No, sir. Q. That track from Jefferson street on up to the point where he was struck,—what was the grade of the track? A. I judge about two per cent, up hill." After the train came to a stop I went down to where the man was lying to the side of the track,—on the north side of the track. The brakeman was there at the time and had a lantern. The car was standing right over Mr. Ervin; he was lying about even with the door of the car— half way back of the first car. He didn't live very long. I was not there when he died.

The defendant, at the close of the case in the trial court, filed a demurrer, and still contests in this court the sufficiency of the evidence to sustain the verdict. This attack on the sufficiency of plaintiff's evidence is made from two quarters which will be noticed in turn.

It is first contended that plaintiff's evidence does not show a sufficient user of the railroad track at the time and place of the killing of plaintiff's husband such as to require the defendant's servants to anticipate the presence of the deceased or other persons on or near its tracks. The evidence in its essentials, summarily stated, is as follows: The defendant's railroad runs east and west through the city of Springfield, and the place where the accident occurred is located some eight hundred feet east of Jefferson

street, a street in said city running north and south.
The defendant's right of way was not fenced, and
there is no evidence that any signboards had been
erected or notice given by defendant warning persons
not to use the track as a passageway.  There were
several manufacturing plants located along this line
of railway and in the vicinity, and the track in question
was used at times by employees of these plants, as
well as by persons residing near the place of the acci-
dent.  Since the track had been constructed and bal-
lasted, it had been used by pedestrians and employees
of such factories and shops going to and returning
from their work and from the business section of the
city; and it had been used by laundry girls going to
and returning from their work, and by women and
children going to and returning from church; persons
had been seen using it as a pathway, both day and
night, and trains had been seen switching back and
forth when pedestrians were passing along the road-
bed.  The roadbed had been used in this way ever
since it was built, and there had been seen as many as
from one to fifteen persons walking on the track at a
time.  In this case, there is no evidence of well-worn
foot-paths—worn by human feet—or of any gaps,
gates or stiles appurtenant to the right of way.  But
at a point some two or three hundred feet east of
where the accident occurred, Clinton street comes down
to the defendan's right of way, and someone had
placed a plank across a ditch on which people crossed
onto the railroad.  There was a foot-path leading
from this plank up over the hill along which people
passed in going to and from the railroad track, to Jef-
ferson street and to other points in the vicinity; but
there was no showing that such foot-path could be seen
by defendant's servants operating its trains.

The theory on which plaintiff's instruction No.
1 authorizes a recovery is either (1) of a discovered
peril and a failure to use proper diligence to prevent

the injury after such discovery, or (2) that the place on the railroad track on which plaintiff's husband was killed had been used for a number of years with the acquiescence of the defendant, and that such user was of such a character that the engineer in charge of the engine ought to have anticipated that persons would be on the track and consequently owed to the plaintiff's husband a lookout duty.

The evidence as to user, comprehensively considered, tends to show that at the time and place of the accident, the public, without objecion on the part of the railroad company, had used the railroad track as a pathway. Such testimony undoubtedly furnished a sufficient showing of user by the public of the defendant's track as a pathway as to become at least a mixed question of law and fact requiring the submission of the case as to user to the jury, under proper instructions by the court. [Fearons v. Railroad, 180 Mo. 223, 79 S. W. 394; Scullin v. Railroad, 184 Mo. 707, 83 S. W. 760; Eppstein v. Railroad, 197 Mo. 736, 94 S. W. 967; Cotner v. Railroad, 220 Mo. 307, 119 S. W. 610.]

The rule imposing on the railway company a lookout duty requires that the facts surrounding the given case shall be of such character as would warrant a reasonably prudent man to expect or anticipate the presence of persons at the point on its road where the injury occurred. The burden of establishing these facts showing the nature and extent of the user rests upon the party alleging them. On the other hand, the operatives of a railway are entitled, in the absence of such showing, to the presumption that there is a clear track, and while care and caution should be exercised in the operation of their trains, they are not responsible to trespassers for a failure to be on the alert to discover them, in the absence of any reasonable grounds for the expectation or anticipation of their presence on the track. In other words, they are not

specially required to look out for persons who have no right to be there and whose presence was neither expected nor anticipated. Under those circumstances, the liability results from an injury inflicted after the discovery of their presence which could then have been avoided by the exercise of ordinary care. But, again, if it is at a point where there is reasonable ground for expecting or anticipating the presence of persons, the presumption of a clear track is destroyed, and even though the persons be trespassers, it does not relieve those in charge of the moving cars from keeping a careful lookout for the persons so expected to be present at that point. [Fearons v. Railroad, supra, l. c. 223.] Liability in each instance is predicated of knowledge or notice of user. Such notice may be proved by the long-continued going to and fro of people more or less constantly. [Eppstein v. Railroad, supra, l. c. 734.] Where a railroad track was used by the public as a foot-path, the question of license or implied invitation to use the track is a question of fact for the jury, and in such cases it is the province of the jury to determine whether or not those operating a train thereon under the circumstances had reasonable grounds to anticipate the presence of persons thereon. [Reyburn v. Railroad, 187 Mo. l. c. 573, 86 S. W. 174; Morgan v. Railroad, 159 Mo. 262, 60 S. W. 195; Chamberlain v. Railroad, 133 Mo. 587, 33 S. W. 437, 34 S. W. 842; Everett v. Railroad, 214 Mo. l. c. 84, 112 S. W. 486; Fearons v. Railroad, supra; Cotner v. Railroad, supra; Scullin v. Railroad, supra; Hufft v. Railroad, 222 Mo. l. c. 303, 121 S. W. 120; Eppstein v. Railroad, supra, l. c. 736.] In its last analysis, the final conclusion is predicated on the fact that the operatives of a railroad company at certain points along its line have reasonable grounds, by reason of the continuous use of the track at that point by pedestrians, to expect or anticipate the presence of persons so near the railroad track at such points as to endan-

ger them. [Ahnefeld v. Railroad, 212 Mo. l. c. 300, 111 S. W. 95.]

One of the pivotal issues of the case is made to rest upon the determination of the fact whether the engineer in charge of the train discharged his duty by promptly observing the stop signal given by the brakeman, and whether, after he observed it, he promptly responded to such signal by stopping the train. No serious question seems to be raised by either party but that the brakeman gave the proper stop signal to the engineer at a proper time and in a proper manner.

Under the evidence presented in the record, there was no eye-witness who saw the deceased in front of th train before his injury except the trainmen themselves who were witnesses for the defendant. The evidence of the conductor and brakeman, corroborated by other witnesses for the defendant, was to the effect that immediately before the accident they were standing on top of the forward car keeping a lookout in front of the moving train; that when they first saw Ervin he was something like a car's length ahead, walking between the double tracks; that immediately afterwards, he started to walk across the track on which the train was moving, and that as soon as he made this movement, the conductor and brakeman saw him and called to him and the brakeman gave the stop signal with his lantern, and that as soon as he gave the stop signal the engineer applied the air; that the brakeman kept signaling the engineer until the train was stopped; that the engineer answered the first signal; that the brakeman continued to halloo until the man was hit. These witnesses variously estimated the distance of Ervin when he passed onto the track in front of the train to be from twenty to thirty-five feet ahead of the forward car; they testified that they at once commenced signaling the engineer and hallooing to Ervin as soon as he was in danger, and that the

train at this time was running about four or five miles
an hour. This evidence tends to show that the train-
men after they saw the man in a place of peril used all
the means at their command to arrest the progress of
the train, to warn the man of the danger he was in,
and to prevent any injury to him. Defendant's expert
evidence tended to show that such a train could be
stopped under the conditions existing at the time and
with the appliances at hand within from thirty-five to
fifty feet.

The defendant contends that under this condition
of the evidence as to the management and control of
the train by the servants of the company after the
danger was actually discovered that there was no neg-
ligence shown, but that on the contrary the evidence
of the eye-witnesses affirmatively shows that the ut-
most diligence and care was exercised. It is urged
with great earnestness that the plaintiff wholly failed
to make out her case and that defendant's demurrer
to the evidence on that account should have been sus-
tained.

Had this been all the evidence in the case, much
could have been said in favor of sustaining defend-
ant's demurrer, but this contention overlooks the evi-
dence of three witnesses who testified for the plaintiff
whose testimony tends to conrovert the evidence for
the defendant in material respects.

Eliza West stated that at the time of the accident,
which occurred about 7:15 o'clock on the evening of
October 29, 1909, she lived with her husband in a house
about two hundred yards from where the accident oc-
curred. I was standing at the time at the north cor-
ner of my porch looking toward the Sterling Iron
Works, straight down the track. I heard a man halloo.
The hallooing seemed to be back west from where I
was. I looked, and when I looked I saw a man waving a
lantern. He turned and was going from the east end of
a train to the west end; he was going west on the car,

hallooing. When I first saw him, he was waving his lantern slow, and then commenced to wave it fast, hallooing as he went, and was hallooing all along; at the same time he was going west. He was saying, "Hey! Hey! Can't you see or hear nothing!" When he got to the engine, when the engine stopped, he says, "Can't you see or hear me! Can't you see this lantern or hear me! You have run over some one!" He says, "G-d d- you, can't you hear nor see nothing!" While I was down there I saw the brakeman who made this statement: "There was no use of that man being killed; if the engineer had paid attention to his signal he would not have been killed." I can't say for sure whether I heard a bell ringing. There was no whistle blown.

G. W. West also testified as follows: Just before Mr. Ervin was killed, I was at my woodpile preparing wood for the night. I was looking towards the northwest which would be in nearly a direct line with the place where Mr. Ervin was killed. The first thing I saw was the brakeman on the east end of the car which was in front. He had a lantern in his hand. The first thing I saw, he gave his slow stop and the engineer didn't notice it, and he gave it to him fast and then he didn't notice it, and the brakeman went to hallooing, and the engineer didn't seem to pay any attention to that; the brakeman turned on top of the car and started back toward the engine still giving the signal. He was running back there hallooing, and he hallooed out and says, "Can't you hear or see nothing? G-d d— you, can't you see nothing or hear nothing at all? You will run over something or somebody!" He was running back toward the engine on top of the car waving his lantern. The engineer finally got the signal and cut off the steam and stopped the engine. The brakeman in the meantime had gone from the east end of the car to the west end of the car. I didn't see Mr. Ervin during this time on ac-

count of being on a hillside. I could see the brakeman on the car. From the time I saw the brakeman give the first signal to the time the train came to a stop, I suppose the train had run about the length of three rails,—that is, about ninety-nine feet. I went down to where Mr. Ervin was killed soon afterwards.

Charley Adams, another witness for the plaintiff, stated that on the night of the accident he was walking east on defendant's railroad track and that the train in question passed him at Jefferson street, going east. I noticed the train and its make-up but did not pay much attention, saw that the boxcars were ahead of the engine and the engine was pushing the cars in front of it. They stopped up east of Jefferson street and I passed the train when it was standing still. It was at the time headed east. There was a man lying there; I supposed he was dead at the time. I passed on by the engine. After they crossed Jefferson street going east, I heard no ringing of bells nor the blowing of any whistle until the train stopped. I went right on by the train. It was then getting dark. I saw one man standing on one of the boxcars, on top of it, and he had a lantern in his hand. I saw only one man. I did not stop where the man was lying; went right on. I saw a man standing there with a lantern.

If the jury believed the testimony of West and his wife, then the brakeman on top of the car saw the peril of Ervin when he was on or near the track and gave the stop signal long enough before the collision for the train to move ninety-nine feet before it was stopped, and under the evidence that deceased after his injury was some twelve feet back of the front of the first car, the train ran some eighty-seven feet after the alarm was given before it actually struck him. Under the expert testimony introduced by the defendant itself, a train equipped as this one was could ordinarily have been stopped within from thirty-five to fifty feet, and under such testimony, the exercise of

reasonable diligence after the stop signal was seen by by the engineer would have prevented the catastrophe.

The evidence further tended to show that the place at which the witness, West, and his wife were located at the time they saw the brakeman on top of the car was on an embankment, and that it was covered with trees, and that there were trees at the place where Ervin was killed, on both sides of the track. Many arguments have been made before us to show the unreasonableness and incredibility of the statements made by these three witnesses and that from the physical surroundings their evidence is entitled to little consideration. Whatever weight these considerations are entitled to are solely questions for the jury at the trial who alone are authorized to pass on the weight of the evidence and the credibility of witnesses. It is apparent from the most casual examination of this evidence that it was in direct conflict with the testimony given for the defendant; and it was entirely within the province of the jury to say whether under the circumstances they would believe the statements of the plaintiff's witnesses or the statements of the defendant's witnesses, and we have no mandate to review their decision.

From these considerations, in view of the evidence, we think the court committed no error in overruling defendant's demurrer to the evidence.

The respondent contends that appellant cannot complain in this court of instructions given in her behalf in the trial court for the reason that the appellant failed at the time to object to each, specifically. No Missouri cases are cited in support of this contention. The following language of ROMBAUER, P. J., in the case of Whipple v. Peter Cooper B. and L. Assn., 55 Mo. App. l. c. 558, wherein this question was considered, effectually disposes of this point: "The practice in many states requires specific exceptions to the charge of the judge, and disregards exceptions taken to in-

structions as a whole, unless the whole charge is erroneous. The practice in this state, however, has always been to the contrary, and an exception to instructions generally was always considered sufficient without pointing out in detail the specific instructions challenged.'' [See, also, Weber v. Railway Co., 100 Mo. 1. c. 205, 12 S. W. 804, 13 S. W. 587.]

But the recovery of judgment by plaintiff in this case was also had on the theory that although the brakeman on top of the front car duly signaled the engineer operating said train to stop, and on the theory that the signal was given in time so that the engineer could have stopped the train by the use of ordinary care and prudence and the injury and death of the said Ervin could thereby have been avoided, and the said engineer negligently and carelessly failed to observe said signal, or that he observed said signal and thereafter failed to use ordinary care and prudence to stop said train and prevent the injury to the deceased, and that by reason of such negligence and carelessness the train struck and killed the said Ervin, the company would be liable, provided the jury also found that at the time and place of the injury the engineer should have expected the presence of persons on the track. While respondent's instruction upon which recovery was had proceeds upon this theory, she has by her attorneys strenuously contended in this court that the failure and neglect of the engineer to see the stop signal, or his negligent failure, after seeing it, to stop the train, would impose a liability upon the defendant company whether the operatives of the train had reasonable grounds to anticipate the presence of persons on the track or not.

Our Supreme Court in many cases, and they are uniform in their statement, has declared that if at the place where the man was injured the defendant owed no duty to look out for persons on the track, then, in order to recover, plaintiff must show that the person

injured was actually seen by the engineer in time to have warned him and thus avoided the injury. [Frye v. Railroad, 200 Mo. 377, 405, 98 S. W. 566, citing Rine v. Railroad, 88 Mo. 392; Barker v. Railroad, 98 Mo. 50, 11 S. W. 254; Sinclair v. Railroad, 133 Mo. 233, 34 S. W. 76; Reyburn v. Railroad, 187 Mo. 565, 86 S. W. 174.]

In this case the facts are undisputed that both the brakeman and conductor did see the man's peril at the time he went upon the track in front of the train, and that the engineer did not see him until after the injury had occurred. The evidence is also undisputed that the brakeman immediately—as soon as deceased was in danger—gave the engineer the proper signal in the proper manner which the engineer saw but to which, the plaintiff's evidence tends to show, the engineer gave no attention, and that if he had promptly given heed to such stop signal the train could have been stopped in time to have saved the man's life. The essential facts of this case from which the law is to be declared, if not identical with, at least bear a close analogy to the facts in the case of Hufft v. Railroad, 222 Mo. 286, 121 S. W. 120. In that case, the train was backing toward the east, the engine being on the west end of the train. The boy who was injured had caught his foot in a frog in the railroad track to the rear of the train at a point in the switchyards where the railroad company had a right to expect a clear track. At the time of the accident, the train was moving backward. The brakeman, when he saw the danger the boy was in, immediately gave a stop signal to the engineer and ran to the boy and undertook to get his foot out of the frog. Finding himself unable to do this, he gave a second stop signal to the engineer, and then came back to where the boy was, took hold of him and removed his body from the track as far as possible. The train, however, was not stopped and kept moving, and while the brakeman was holding the

boy, one of the wheels of the rear car passed over
the boy's leg. The evidence further tended to show
that the engineer at no time knew of the danger until
he received the second stop signal, nor did he know
the boy's perilous position until after the injury. The
evidence showed that the engineer did not see the first
stop signal but. did see the second stop signal and
promptly obeyed it by stopping the train. The other
brakeman testified that he heard the brakeman who
was on the ground call "stop" in a distressed tone,
and that he then also gave the stop signal from the
top of his car. The Supreme Court uses the follow-
ing language: "Grant it to be true that a prompt
response to the stop signal would have saved the plain-
tiff, yet if the plaintiff was at a place where the engi-
neer in,charge of the engine had no right to expect
persons, other than employees, to be, his failure would
not be negligence as to the plaintiff. In other words
if the engineer was at a place where he was entitled to
expect a clear track, his duties as to looking out for
stop signals is quite different to what they would be
if he was running his train at a place where he was
not entitled to expect a clear track. If the place of
injury was where the engineer had the right to expect
a clear track, then as said before, his failure to im-
mediately heed the same would not be negligence to-
ward plaintiff, because such signals at such a place
would not be given for his benefit. In other words,
stop signals at such a place would not contemplate
plaintiff's presence there and a failure to heed them
might be negligence as to some parties, but not as to
him." [l. c. 303 and 304.]

The respondent's attorneys in a very learned sup-
plemental brief and argument have sought to distin-
guish the Hufft case from the one under consideration
in that in the Hufft case the evidence showed that the
engineer did not see the first warning signal of the
brakeman, but that in this case the uncontradicted evi-

dence is that the engineer did see the emergency or stop signal but did not respond to it. This distinction as claimed by counsel makes the law declared in the Hufft case inapplicable to the facts of the present one. The contention is that in this case the respondent has a right to recover if the engineer saw the emergency or stop signal and did not respond to it, although no uses was shown by plaintiff and although the engineer had the right to expect a clear track at the place where the accident occurred. The reply to this contention is that in the Hufft case the opinion of the Supreme Court considered both propositions and declared that if the engineer in charge of the train did not know that deceased was on the track, and negligently failed to see the stop signal given by the brakeman, or if he saw the signal and negligently failed to respond to it, in either event, if the defendant's engineer at the point where the accident occurred had the right to expect a clear track, then there would be no liability on the part of the defendant company. We are unable from an examination of the Hufft case to believe that our Supreme Court in the last half of subdivision III of their opinion intended to contradict what they had unequivocally said in the first half; but that the two parts of the opinion are to be reconciled by considering the last half as a specific commentary on the facts and instructions of that case wherein the engineer saw the second signal and promptly responded to it. We have not undertaken to consider this question on its merits independent of the opinion of the Supreme Court because under the mandate of the constitution its opinion on this question is controlling authority, whatever may be the opinion of this court as to the correctness of its decision.

The plaintiff's instruction as to user in this case contains the following statement: ". . . and if you further find that the track where he was killed and for six hundred feet or more west thereof, at said time

of day or night, had been used for several years with the knowledge, consent and acquiescence of the defendant, its servants, agents and employees by persons walking thereon to and from their work and home, . . ."

As we have stated, the general rule as to user, prevailing in Missouri and many other jurisdictions, state and federal, is that whenever railroad engineers are approaching places where they have reasonable grounds to anticipate the presence of trespassers in places of danger near the track, there is imposed a duty upon them to keep a careful lookout, and such railroad servants are bound to be on the alert to anticipate the presence of such trespassers and guard against injury to them, and in case of failure resulting in injury, such negligence becomes actionable. This principle is thoroughly imbedded by many decisions in the law of this State. [Fearons v. Railroad, supra, and cases therein cited; Ahnefeld v. Railroad, supra, and cases therein cited.]

Appellant complains that plaintiff's instruction as to users was inadequate and did not properly declare the law to the jury. In the consideration of this objection, it may be said by way of preliminary observation that there are at least two indispensable constituents of user that should be properly presented by the instruction in order to aid the jury in the proper determination of such cases: There are first the physical facts necessary to constitute the user, that is, the character, nature, and duration of the user. Another element is the consent of the defendant company to such user, or its knowledge of, or acquiescence therein. As to actual permission or consent, none was proven in this case to have been expressly given by the defendant; and, if any such consent existed, it was only such as was to be reasonably inferred or presumed from all the attendant circumstances, that the

defendant had with knowledge at least acquiesced in or tacitly assented to such user. It was competent to prove the defendant's knowledge of such user of its track by facts and circumstances that might, in themselves, have come short of actual invitation. The whole question as to when a lookout duty is imposed in a given case by defendant's knowledge of user, or the defendant's company's implied consent, seems to rest largely upon the peculiar physical facts as to the duration and character of such user. Especially is this true where it is sought to charge the defendant company with permission or consent by reason of its mere silence or acquiescence. It is quite evident from the very nature of things that there can be no consent or acquiescence in the user without knowledge, actual or constructive. The character and nature of the user necessary to impart knowledge to the defendant is a question of law to be declared by the court in its instructions to the jury. The exact character and amount of knowledge to impart a lookout duty to the defendant's train servants has at the hands of the courts received a diversity of statement in details and local coloring, but a substantial unity in essential requirements. At the hands of our own Supreme Court the question has received a prolonged and exhaustive consideration. A railroad company may be entitled to a clear track, and yet by reason of the user, its servants would have no right to expect one. ''In such a case, out of tenderness and regard for life and limb, it has been held that where the general public have been invited to use the track by the tacit consent and long acquiescence of a railroad company in permitting the open known, free, continuous and extensive use thereof by footmen, then it owes a duty to such footmen to use ordinary care to protect them from being run down and maimed or killed. [Frick v. Railroad, 75 Mo. 595; Williams v. Railroad, 96 Mo. 275, 9 S. W. 573; Chamberlain v. Railroad, 133 Mo. 587, 33 S. W.

437, 34 S. W. 842; Morgan v. Railroad, 159 Mo. 262, 60 S. W. 195; Fearons v. Railroad, supra; Fiedler v. Railroad, 107 Mo. 645, 18 S. W. 847; Eppstein v. Railroad, supra." Frye v. Railroad, supra, l. c. 400, 401.] This opinion was cited, quoted and approved in Ahnefeld v. Railroad, supra, l. c. 301. In the Eppstein case, the instruction given and approved, concerning user, was as follows: ". . . and that at the place where said Eppstein was struck, many people .were at that time, and had been for several years prior thereto, accustomed to use said track as a footpath to and from points in the southern part of the city of Boonville and beyond, and that said track had been used in this way *continuously for many years,* and that defendant's servants and agents in charge of said train could reasonably have expected to find persons on said track at that place, *on account of the frequent and continuous use thereof by footmen.* . . ." The rule announced in the federal courts is substantially the same, namely, that if the public for a long period of time continually and customarily and openly and notoriously has used the track with the knowledge and acquiescence of the railroad company, the consent of such railroad company to such use may be presumed. [Felton v. Aubrey, 74 Fed. l. c. 360.]

The learned attorneys for respondent in this case insist with great earnestness and ability that the case of Cotner v. Railroad, 220 Mo. 284, 119 S. W. 610, furnishes a precedent and is authority for instruction No. 1 given for the plaintiff in this case and that such instruction and the instruction in that case are substantial duplicates of each other. We have therefore given that case careful consideration. In the Cotner case, the plaintiff testified that the track at the place where the injury occurred had been used as a footpath ever since he had lived in the neighborhood, for about four years; that all the workmen for three sawmills used it as a foot-path, and, besides, many others

used it regularly. The testimony also showed that the injury occurred near the town of Steele and that the station agent of the defendant at Steele knew that the right of way and tracks were used by pedestrians, that the track was used by pedestrians both day and night. The court on behalf of the plaintiff gave an instruction to the effect that if the railroad track at the point where the injury occurred had been used for a long time prior thereto with the knowledge of the defendant, its servants, agents and employees, by pedestrians as a foot-path leading to and from the village of Steele, then it was the duty of the defendant's employees in charge of and operating its engine and train of cars, when approaching said portion of defendant's railroad which was so used as a pathway, to keep a lookout for persons and to ascertain that said track was clear. On behalf of the defendant the jury was instructed that although they might find from the evidence that persons were in the habit of walking on the railroad track from time to time where plaintiff was injured, and that defendant knew it, yet, unless they further found that its track at this place was habitually so used, and that it knew it, then the defendant's servants in charge of the train owed no duty to keep a lookout at that place for persons on the track. The Supreme Court in commenting on the evidence and the instructions, said (p. 309): "Now in this case, the jury by their verdict found that the track of the defendant at the town of Steele, where the plaintiff was injured, *was habitually used* by persons as a passway leading to and from the village of Steele, and that defendant knew that such was the custom and usage, . . ." And again (p. 310): ". . . and the evidence was that from the time of the construction of this railroad through the town this track had been used as *a regular passway,* both day and night, and in a word, as found by the jury, it had been *habitually so used.* . . . In our opinion, the court's instruc-

tions for the plaintiff and the defendant upon this question was a fair statement of the law as to the respective rights of the plaintiff and the defendant, at the time the plaintiff was injured, . . ." In that case, it will be seen that the statement of the law as to user, as given in the instruction for the plaintiff and in the instruction for the defendant, was considered together as one declaration of the law of the case on the subject and that the court declared that such was a fair statement of the law. The evidence in that case showed that the track had been used as a regular passway by pedestrians, both night and day, and, in a word, it was found by the jury that such track had been so *habitually used.* The rule as thus laid down,—and it seems to contain a reasonable statement of the physical facts necessary to be established to constitute user, is that it requires the *habitual use* of the track of the defendant by pedestrians as a foot-path with defendant's knowledge and consent, or acquiescence without objection. Measured by these standards, so often announced by our Supreme Court, we are unable to approve the instruction in the case at hand as it comes far short of the requirements thus laid down by the Supreme Court. The instruction (No. 1) at most only requires that the track must have been used for several years with the consent, acquiescence and knowledge of the defendant and its servants by persons walking thereon to and from their work and home. It will be seen on a close examination of this language that it does not require that the jury shall find that there was an habitual use of the railroad track as a passway by pedestrians, or that it was constantly so used by the public, or words of an equivalent meaning. Under the terms of this instruction, the jury would have the right to infer that mere desultory, occasional or fugitive use of the railroad track by pedestrians would have been a sufficient user. But more than this is required by the standards of the law. Such travel on the track must

be so continuous, frequent, and well-established as to raise an inference of knowledge and acquiescence in such use on the part of the defendant in order to impose upon its employees the duty of anticipating the presence of pedestrians at the point of injury. As to the portion of plaintiff's instruction concerning user, the number of persons is not designated, and the use of the track by a very limited number would be a compliance with the instruction as given. It was not sufficient proof of user that the jury should have found that the track at the point of injury had been used "by persons walking thereon to and from their home and work," nor that persons at such point where plaintiff's husband was killed had been in the habit of walking on the railroad track from time to time with defendant's knowledge. [Cotner v. Railroad, supra; Lamb v. Southern Ry. Co. (S. C.), 67 S. E. 958.]

We think from the authorities cited the instruction is wholly inadequate in its statement of the requirements of user and is defective.

Appellant further assigns as error that plaintiff sued upon one section of the statutory Damage Act and recovered judgment under another section. In other words, that plaintiff's action should have been prosecuted exclusively for the recovery of a penalty and not for compensation, and that the issues presented by her petition were not supported by the proof, and that the allegations of her cause of action were unproved in their entire scope and meaning. Testimony was introduced for the plaintiff at the trial over defendant's objections as to the amount of earnings of the deceased, his age, his habits, and his earning capacity as a moulder, as well as evidence as to his being the head of a family with children. In instruction No. 2 given for the plaintiff the court gave the law of the case as to the measure of damages and no other instruction was asked on that question either by plaintiff or defendant. That instruction authorized a

recovery of compensatory damages, viz., such damages as the jury might deem fair and just with reference to the necessary pecuniary injury plaintiff had suffered by reason of her husband's death.

The validity of appellant's assumption as to there being a material variance in this case rests upon the determination of the question as to which section of the Damage Act the action is prosecuted under, the appellant claiming that it was brought under section 2864, Revised Statutes 1899, as amended by the Laws of 1905 and carried into the revision of 1909 as section 5425. This section provides, *inter alia,* that in case of injury to a human being resulting in his death, caused by the negligence, unskillfulness or criminal intent of any officer, agent, servant or employees of a corporation, whilst running, conducting or managing any locomotive, car or train of cars, the defendant shall forfeit and pay as a penalty, for every such person so dying, the sum of not less than two thousand dollars and not exceeding ten thousand dollars, in the discretion of the jury, which may be sued for and recovered by the wife in case the person killed was a husband.

This section of the Damage Act, prior to the amendment of 1905, fixed the recovery of damages in case of such killing at the sum of five thousand dollars, and did not contain the clause, "shall forfeit and pay as a penalty." In action prosecuted thereunder, the jury, as the law stood before the amendment, had no discretion as to the amount of the judgment in case the finding was for the plaintiff; they could only allow the liquidated sum of five thousand dollars. This section, both before and after the amendment of 1905, has been held by our Supreme Court to give only punitive damages and not compensatory damages. The interpretation of this section came under consideration of the Supreme Court in the late case of Young v. Railroad, 227 Mo. l. c. 332, 12 S. W. 19, in which the court, referring to this section, said: ". . . the

damages are not given as compensation to the party aggrieved, but as a penalty which the law prescribed for the negligent killing of a human being; it is all penal in its character and in fixing the penalty the jury have a right to consider the conduct of the negligent party beyond the mere finding that he was negligent; they may consider whether the conduct which resulted in the catastrophe arose from mere inattention, or was willful, wanton or reckless. That is what the jury does in assessing the punishment for a crime and it is what the amendment of 1905 to section 2864 authorizes the jury to do in assessing the amount of the penalty under that section of the statute."

The language of the petition in this case leaves no doubt that the damages are sought to be recovered under what is known as the humanitarian doctrine; that the servants and agents of the defendant corporation by the exercise of ordinary care did discover or by the exercise of ordinary care could have discovered the peril of the deceased on the track in time to have prevented the injury by the use of the appliances at their command. An examination of the petition shows that it makes no reference to any particular section of the Damage Act and does not specify under what section recovery is sought, and that it does not claim that by reason of the negligence of the defendant's servants or any wrongful act of theirs in the killing of the plaintiff's husband, any penalty accrued to her, and no claim is made of punitive damages for such acts. But under the rules of pleading, it was not necessary that the petition should state under what section of the statute the action was brought, but it was only required to contain a clear and concise statement of the facts constituting the cause of action; and in this case, to recover damages, it was only necessary to state facts which would bring the action under some section of the Damage Act and it need not make specific reference to any certain section of the Act.

[White v. Maxcy, 64 Mo. 552; McKenzie v. United Rys. Co, 216 Mo. 1, 115 S. W. 13.]   The allegations of the petition in this case state a cause of action for the killing of the plaintiff's husband by reason of the negligence of the defendant's servants in managing its locomotive and train and thereby state a case which brings it within the purview of section 2864, Revised Statutes 1899, to-wit, for the death of a person other than a passenger by reason of the negligence of a servant running a public conveyance.  [McKenzie v. United Rys. Co., supra, l. c. 14; Casey v. St. Louis T. Co., 205 Mo. 721, 103 S. W. 1146; McMurray v. Railroad, 225 Mo. 272, 125 S. W. 751.]   Hence the theory on which the evidence was introduced and the instruction given as to the measure of damages was erroneous as it allowed the jury to fix the amount of plaintiff's pecuniary loss by reason of the death of her husband, whereas, under the section of the statute on which the suit was brought, the damages ought to have been restricted to the penalty.  In arriving at the amount of the penalty, however, the jury would have the right to go beyond the mere question of the negligence of the defendant and in estimating damages consider whether the accident arose from mere inattention of the defendant's servants and agents, or whether it was willful, wanton or reckless, and assess the damages according to such finding.

But the attorneys for respondent seek to bring this case within the reasoning of McKenzie v. United Rys. Co., supra, and contend that the instruction is harmless as held in that case, and ask the question, "Does the fact that the court instructed the jury that they could assess plaintiff's damages at a sum not exceeding ten thousand dollars require a reversal of the judgment when the jury awarded $6500, which was within the penalty given by the statute?"  In the McKenzie case, the judgment was for $5000, and the only amount allowed by the penal statute as it then ex-

isted was the sum of $5000, and the Supreme Court held that as the judgment was rendered for the amount which the law prescribed, the erroneous instruction was not material error. The Supreme Court in that case said (p. 18): "If no other reversible error intervened, it (the judgment) was for the right party and for the right amount. How can it be said to have been injurious to the defendant when the only thing urged against it is that the plaintiff not only proved that she was entitled to recover five thousand dollars under the penalty statute, but assumed the burden of establishing to the jury that she was in fact damaged to that amount and carried both burdens successfully?" The reasoning of that case can not be applied to the facts of this case because the law and the facts of the two cases are not parallel. As we have stated, the McKenzie case was prosecuted under the statute which fixed the penalty at $5000, and if the plaintiff recovered at all in the case, she must recover that penalty and only that penalty. The trial court, however, instructed the jury that they could assess the plaintiff's damages at a sum not to exceed $5000. The Supreme Court in the consideration of the question whether the error in the instruction was such as to require a reversal held that it was harmless where the jury awarded $5000, the penalty actually given by the statute, and the reasoning is supported by this further statement: "The evidence as to the value of her husband's services and the number of minor children left surviving, is no ground for reversing the judgment, *because it in no manner increased the damages beyond the amount the plaintiff was entitled to recover, if anything,*" it being immaterial. [Citing Schlereth v. Railroad, 115 Mo. l. c. 102, 21 S. W. 1110.] But under the penalty section as it now stands and under which this action is now prosecuted, the penalty is to be fixed by the jury on a sliding scale of damages, not less than two thousand dollars and not

more than ten thousand dollars. If, in this case, the
judgment had been for two thousand dollars, under
the evidence and instruction above referred to, the
reasoning of the McKenzie case could be applied with
much force; but where the penalty is to be fixed be-
tween a maximum and minimum limit, we have no
means of saying that the value of plaintiff's hus-
band's services, his earning capacity, his being the
head of a family, did not influence the jury in awarding
the plaintiff a larger sum, as compensation for her
loss, than they would otherwise have allowed for mere
punitive damages.

Other objections are made by appellant and other
assignments of error are urged, but after an exhaust-
ive consideration of all of them we find that the trial
court committed no error materially affecting the mer-
its except as hereinbefore stated.

For the reasons herein appearing, the judgment
is reversed and the cause remanded for a new trial.
*Gray, J.,* concurs; *Cox, J.,* concurs in the result and.
files separate opinion.

## CONCURRING OPINION.

COX, J., concurring. I concur in the result
reached in this case by which it is reversed and re-
manded, but do not concur in the holding that because
the engineer was backing his train and could not see
deceased on the track, and did not know as a matter of
fact deceased was on the track, he was not guilty of
negligence towards him in failing to obey the emerg-
ency stop signal after he saw it.

To my mind it is a monstrous doctrine to say that
an engineer in charge of a backing train who could
not see the track ahead, and who must depend upon
signals from the brakeman for information to guide
him in the movement of the train, can deliberately re-
fuse to obey an emergency signal, and by such refusal

destroy a human life, then excuse himself, as was attempted in this case, by saying he did not know there was a man on the track, but thought the signal meant there was danger of derailing the train.

While the deceased may have been a trespasser, and the engineer entitled to expect a clear track, yet, the very purpose of the emergency signal was to convey information to him that there was danger ahead, and that something unexpected and extraordinary had happened, making it necessary to stop the train quickly to avoid injury of some character. In this condition it was not his "to reason why." His sole duty was to stop the train as quickly as possible, and his failure to do so ought in all reason to make him responsible for whatever injury proximately resulted from a neglect of that duty. In other words, when he saw the emergency stop signal he should be held to have notice of the condition, whatever it was, which made it necessary for the brakeman to give him this signal, and his failure to obey it after seeing it should make him responsible to the same extent as if he had seen what the brakeman saw before he gave the signal. [Chicago, I. & L. Railway Co. v. Pritchard (Ind.), 79 N. E. 508, l. c. 513; Coy v. Indianapolis Gas Co. (Ind.), 46 N. E. 17.]

I do not think the case of Hufft v. Railroad Company, 222 Mo. l. c. 303-304, when closely analyzed is such an authority against the views I have expressed as to compel us to follow it. We, of course, are bound by what the Supreme Court *decides* in a case, but I do not understand that we are bound by the language used in an opinion that is *obiter* in the case. What is said in the Hufft case on this question is as follows: "Grant it to be true that a prompt response to the stop signal would have saved the plaintiff, yet if the plaintiff was at a place where the engineer in charge of the engine had no right to expect persons, other than employees, to be, his failure would not be negli-

gence as to the plaintiff. In other words if the engineer was at a place where he was entitled to expect a clear track, his duties as to looking out for stop signals is quite different to what they would be if he was running his train at a place where he was not entitled to expect a clear track. If the place of injury was where the engineer had the right to expect a clear track, then as said before his failure to immediately heed the same would not be negligence towards plaintiff, because such signals at such a place would not be given for his benefit. In other words, stop signals at such a place would not contemplate plaintiff's presence there and a failure to heed them might be negligence as to some parties, but not as to him.

"*On the theory that there had been no sufficient user shown, then defendant's instruction numbered 2, refused by the court, properly declares the law.* So that it matters not which motion was enteretained by the trial court, there was error in instruction numbered 1 for plaintiff. That is to say, if the trial court meant to declare as a matter of law that such user had been shown, then there was error for that reason, and on the other hand if the court meant to declare that there was no user, and that the place was one where defendant was entitled to a clear track, then the instruction is erroneous, because it imposes the duty to observe the stop signal for the benefit of plaintiff, who, to the engineer, was an unknown and unseen trespasser. *To such a person the engineer only owed the duty of obeying the stop signal after he saw it. He was not guilty of negligence toward the plaintiff until he did see it, any more than he would have been of failing to stop in that class of cases wherein he has a right to expect a clear track and fails to discover a person on the track in time to avert the injury.*" (The italics are ours.)

What was really decided in the extract we have given was that plaintiff's instruction No. 1, was er-

roneous and that defendants refused instruction No. 2, properly declared the law. This refused instruction was as follows:

"2. The court instructs the jury that as to the plaintiff Opal Hufft, the engineer in charge of defendant's engine that backed the cars over said plaintiff's foot was not required to be on the lookout for stop signals, and was not required to stop his engine until he actually saw said signals; and if you believe and find from the evidence that as soon as said engineer saw said stop signals he did all he could to stop his engine and cars, and stopped them, your verdict must be for the defendant."

This instruction declares in effect that in that case the plaintiff was a trespasser at a point where the engineer had the right to expect a clear track, and therefore, the engineer owed him no duty to be on the lookout for stop signals, but it was his duty after having seen the stop signal to obey it, and do all he could to stop the train. The court having decided that that instruction properly declared the law, the language of the opinion in conflict therewith should be regarded as *obiter* and not binding upon us, but we should be guided by what was in fact decided, and the language in harmony therewith. By noting the language italicized in the quotation from the opinion above it will be seen that there is as strong language supporting the view I have herein expressed, as there is opposing it, for the court says: "To such a person (to-wit, an unknown and unseen trespasser) the engineer only owed the duty of obeying the stop signal after he saw it. He was not guilty of negligence toward the plaintiff until he did see it." But when he did see and refused to obey it he was guilty of negligence.

This negligence too was negligence towards the deceased, for it was his position of the peril which caused the signal to be given, and it was given for his express benefit. If the engineer was not guilty of

negligence towards deceased in failing to obey the emergency signal after he saw it, then all the Railroad Companies would have to do to avoid all liability to trespassers under all circumstances, would be to run their trains backwards, and keep the engineer in a position where he could not see the track ahead of the moving train, and hence, could not know that a man on the track caused the signal to be given, and then no matter how often and how urgent the signals might be, he could disregard them, though seeing them, and ruthlessly run over and kill anyone on the track, and nobody be required to answer for it.

I cannot assent to that position, but am of the opinion that the dictates of humanity as well as the general rule which requires all persons to exercise ordinary care for the safety of others, requires that the engineer should obey the emergency signal after he saw it.